### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### (SHERMAN DIVISION)

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-40426** |
| **CFO MANAGEMENT** | § | |
| **HOLDINGS LLC,**[1] | § | |
| | § | **CHAPTER 11** |
| **Debtor.** | § | |
| | § | |
| | § | |
| **DAVID WALLACE, CHAPTER 11** | § | |
| **TRUSTEE FOR THE BANKRUPTCY** | § | |
| **ESTATE OF CFO MANAGEMENT** | § | |
| **HOLDINGS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. --** |
| | § | |
| **CPIF Lending, LLC, a Washington** | § | |
| **Limited Liability Company** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

### COMPLAINT AND OBJECTION TO CLAIM

**COMES NOW**, David Wallace, Chapter 11 Trustee for the Bankruptcy Estate of

CFO Management Holdings, LLC, and files this, his *Complaint and Objection to Claim*

and, for such, would respectfully show the Court as follows:

---

[1] The following entities' bankruptcy cases and estates have been substantively consolidated with that of Debtor CFO Management Holdings, LLC (EIN# XX-XXX6987) for all purposes (see Docket No. 248): Carter Family Office, LLC (Case No. 19-40432); Christian Custom Homes, LLC (Case No. 19-40431); Double Droptine Ranch, LLC (Case No 19-40429); Frisco Wade Crossing Development Partners, LLC (Case No. 19-40427); Kingswood Development Partners, LLC (Case No. 19-40434); McKinney Executive Suites at Crescent Parc Development Partners, LLC (Case No. 19-40428); North-Forty Development LLC (Case No. 19-40430); and West Main Station Development, LLC (Case No. 19-40433). The following mailing address can be used for the consolidated Debtor with respect to these cases: c/o David Wallace, Chapter 11 Trustee, 4131 North Central Expressway, Suite 775, Dallas, Texas 75204.

## I.   JURISDICTION AND VENUE

1.     This Court has jurisdiction over this proceeding in accordance with 28 U.S.C. § 1334(b). This Court can hear and determine this matter in accordance with 28 U.S.C. § 157 and the standing order of reference of bankruptcy cases and proceedings in this District. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §157(b)(2)(A), (B), (C), (F), (H), (K) and (O). The bases for the relief sought are found in §§ 502, 503, 506, 510, 544, 547, 548, 550, and 551 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") and Rules 3007, 3012, and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2.     Plaintiff consents to the entry of final orders by the Bankruptcy Court for all matters over which this Court has jurisdiction in this proceeding.

## II.   PARTIES AND KEY PLAYERS

3.     CFO Management Holdings, LLC (the "**Debtor**") and its subsidiaries (as listed in Footnote 1 in this Complaint, the "**Subsidiary Debtors**," and together with the Debtor, the "**Debtors**") each filed voluntary petitions under Chapter 11 of the Bankruptcy Code on February 17, 2019 ("**Petition Date**").

4.     On April 10, 2019, the United States Trustee for the bankruptcy cases filed a notice of the appointment of David Wallace as Chapter 11 Trustee for the Debtors' estates (the "**Trustee**"). *See* Docket No. 143.[2] On April 24, 2019, the Court entered its order

---

[2] All docket references refer to entries in the docket of the above-captioned main bankruptcy case, Case No. 19-40426.

granting the United States Trustee's application to approve the appointment of David Wallace as Chapter 11 Trustee. *See* Docket No. 153.

5.     On August 15, 2019 the Court entered an order substantively consolidating the Debtor and Subsidiary Debtors and their estates for all purposes under the name and case of the Debtor, CFO Management Holdings, LLC. *See* Docket No. 248.

6.     Each of the substantively consolidated Subsidiary Debtors were at one time wholly owned and controlled by Phillip Carter or by entities that Carter controlled, managed, or owned. The Subsidiary Debtors' businesses focused on real-estate development, including developing and selling residential and commercial real estate in Collin and Denton Counties in North Texas and owning and managing a wild-game ranch in Southern Oklahoma. On or about January 18, 2019, the Debtor was created to hold and manage the underlying assets of the Subsidiary Debtors. Such real-estate assets included the following as of the Petition Date:

- **Frisco Wade Crossing** - a substantially completed retail development located at 5855 Preston Rd, Frisco, Texas 75034 in the name of Subsidiary Debtor Frisco Wade Crossing Development Partners, LLC;

- **Crescent Parc** - a partially constructed office development located at 1400 Coit Rd., McKinney Texas 75071 in the name of Subsidiary Debtor McKinney Executive Suites at Crescent Parc Development Partners, LLC;

- **Starling House** - a luxury 8,036 square foot home built in 2018 and located at 4009 Starling Dr., Frisco, Texas 75034 in the name of Subsidiary Debtor Christian Custom Homes, LLC;

- **Ranch** - a hunting ranch located on Duncan Road in Ringling, Oklahoma in the name of Subsidiary Debtor Double Droptine Ranch LLC;

- **Raw Land** - approximately 9.4 acres of commercial raw land located at the southwest corner of Main and Majestic Gardens Dr. in Frisco, Texas in the name of Subsidiary Debtor West Main Station Development, LLC; and

- **Single-Family Residences** - four partially constructed single-family-residence properties located at 1781 and 1786 Courtland Drive and 1756 and 1784 Hidalgo Lane, respectively, in Frisco, Texas in the name of Subsidiary Debtor Kingswood Development Partners, LLC.

7.     Defendant CPIF Lending, LLC ("**CPIF**") is a Washington limited liability company and a creditor and party in interest in the Debtors' jointly administered and substantively consolidated bankruptcy case. Alex Washburn, Columbia Pacific Income Fund II, LP and Columbia Pacific Advisors, LLC ("**Columbia Pacific**") are the listed governors of CPIF.

8.     Bob Guess was a radio personality who managed or controlled Texas First Financial ("**TFF**"), Texas Cash Cow, LLC (a Delaware limited liability company), and North Forty Development, LLC (a Delaware limited liability company).[3] He was also a salesperson for TFF and one of Carter's co-conspirators in a scheme in which investors were defrauded. He is currently a guest of the Texas State Department of Criminal Justice.

9.     James Frinzi was the pre-petition Chief of Staff to Philip Carter at Subsidiary Debtor Carter Family Office, LLC ("**CFO**").[4]

10.    Kelly Carney was the pre-petition President of Commercial Operations for CFO.

11.    Rob Shields is a Senior Underwriter at Columbia Pacific.

12.    Brad Shain is or was the pre-petition Fund Manager at CPIF and is the manager of real-estate-lending strategy at Columbia Pacific.

---

[3] Though similar in name, this entity is separate from Subsidiary Debtor North-Forty Development LLC, a Texas limited liability company.

[4] CFO apparently managed the operations and development of the various Subsidiary Debtor real estate projects.

Complaint and Objection to Claim                                                    4

13.     Will Nelson works in loan production and asset strategy at Columbia Pacific.

14.     Kevin Quinn is an Asset and Underwriting Manager at Columbia Pacific.

## III.  BACKGROUND

15.     As President of the Subsidiary Debtors, Philip Carter participated in a massive years-long multi-million-dollar consumer-fraud scheme. He was aided and abetted in this scheme by brokers and lenders—including CPIF—who were all too eager to enrich themselves at the expense of the scheme's victims, typically senior citizens of limited means whose investments represented in some cases their life savings.

16.     Starting in or before July 2015 and continuing through at least February 2017, Carter raised over $40 million from over 270 investors in several states, most residing within North Texas through the solicitation of real-estate investments by way of materially misleading statements and omissions. Carter then misappropriated some such investor funds to pay off personal tax liens, fund his lifestyle, and make Ponzi payments to investors.

17.     The scheme worked like this: Carter, soliciting funds with or through alleged "brokers" Texas First Financial ("**TFF**") (led by radio personality and self-proclaimed financial guru Bob Guess), received funds from vulnerable individuals, often people in or approaching retirement, to whom they sold short-term, high-yield promissory notes issued by a number of shell companies that were misleadingly named to confuse investors. Investors were told they were investing in Carter's real-estate-development companies and that their investments were backed by hard assets from legitimate real-estate-development projects, including in North-Forty Development LLC ("**North-Forty**"),

a supposed "sure thing" developer of commercial properties in Frisco and surrounding areas. Investors were given promissory notes purportedly entitling them to a return of between nine and twelve percent.

18.    Many of the statements made in soliciting investors were materially false and misleading. Promissory notes given to investors were not secured and were in the name of shell companies with names nearly identical to the names of Carter's actual real-estate companies, but with no underlying assets. In fact, even North-Forty did not hold title to any of the real-estate developments or, upon information and belief, controlling interest in the entities that held such titles. Although the investments in North-Forty and related entities were touted to prospective investors as "low risk," it was not revealed to investors that they actually relied on the success of each link of a long chain of real-estate-development projects for repayment.

19.    Although Carter did, in fact, develop some real-estate projects, he also, upon information and belief, misappropriated investor funds to pay off an over $1.3 million personal IRS tax   lien, make Ponzi payments to other investors, and operate his Oklahoma Ranch.

20.    On May 17, 2016, the United States Attorney's Office served Phillip Carter with a letter informing him that he was the subject of a federal investigation.

21.    On or about August 15, 2016, the Texas State Securities Board issued an Emergency Cease and Desist Order against TFF, Guess, and another Guess-related entity. The Cease and Desist Order noted, among other things, that "[a]t least $875,000.00, and perhaps as much as $1.4 million, of investor funds placed with North-Forty and companies

Complaint and Objection to Claim                                                                6

associated with it, were expended for the benefit of the company's principal [Carter] to cover a $1,391,064.88 federal tax lien that was outstanding as of April 2016."

22.    On or about January 20, 2017, Carter and some of the Debtors filed a state-court interpleader action in Collin County ostensibly to interplead money into the state court for court-supervised payments to investors, Cause No. 219-00305-2017, *Texas Cash Cow Investments, Inc., et al. v. Texas First Financial, LLC, et al.,* 219th District Court, Collin County, Texas (the "**Interpleader Action**"). In this action, Carter and his co-plaintiffs stated that they were in possession of funds to which TFF had a contractual claim but acknowledged that such funds were actually the likely property of investors.

23.    One part of Carter and Guess's scheme involved two commercial construction projects in North Texas. In October 2015, Subsidiary Debtor McKinney Executive Suites at Crescent Parc Development Partners, LLC ("**MES**") and Subsidiary Debtor Frisco Wade Crossing Development Partners, LLC, ("**FWC**") were formed. On December 14, 2015, MES entered into a construction agreement with Crossland Construction ("**Crossland**") to build Crescent Parc, and on February 22, 2016 FWC entered into a construction agreement with Crossland to build Frisco Wade Crossing.

24.    Things did not go well with Crossland (partly related to the MES and FWC projects, but also related to problems that led to litigation in connection with another project known as Prosper Business Park owned by another Carter-controlled entity), and on March 2, 2017 Crossland filed suit against MES and FWC in Collin County District Court for breach of contract and foreclosure of a mechanic's and materialmen's lien.

Complaint and Objection to Claim                                               7

25.     Undaunted, on May 25, 2017 FWC entered into a construction agreement with a different construction company, EMJ Construction ("**EMJ**"), to continue construction on Frisco Wade Crossing, and MES entered into a construction agreement with EMJ to continue construction on Crescent Parc.

26.     On August 29, 2017, the United States filed an Application for a Warrant to Seize Property Subject to Forfeiture in the District Court for the Eastern District of Texas seeking to gain control of the funds deposited in the state-court registry as part of the Interpleader Action and stating that such funds were actually from new investors in continuation of the Ponzi scheme. As a result, the court released the funds into the control of the U.S. Secret Service.

27.     Between approximately August 2017 and July 2018, millions of dollars of construction costs were incurred by EMJ on behalf of MES and FWC in connection with the construction of Crescent Parc and Frisco Wade Crossing. To fund this construction and other Subsidiary Debtor activity, on July 31, 2018 MES, FWC, and other Subsidiary Debtors entered into loan agreements with TBG Funding, LLC ("**TBG**") in the collective amount of $15.6 million ($8.6 million and $7 million, respectively), and on August 2, 2018 TBG filed a deed of trust against FWC and MES properties in the amount of $8.6 million.

28.     CFO executives, including at least Carter, Kelly Carney, and James Frinzi, were discontent with the degree of financial oversight that TBG had imposed as a condition for lending the Subsidiary Debtors money. So, just two days after the United States had filed the warrant application and a mere one month after MES and FWC had entered into the loan agreements with TBG, on August 31, 2018, individuals from CPIF participated in an

introductory call with CFO representatives. CPIF participants on the call included Will Nelson and Rob Shields.

29.    CPIF and its agents, Shields and Nelson, knew or should have known about the state and federal investigations into Carter and the litigation that Subsidiary Debtor entities had been embroiled in with the government, prior lenders, their previous construction contract partners, and cheated investors. Nevertheless, on September 5, 2018 CPIF accepted from CFO a $50,000 refundable deposit and began discussing the start of due diligence on a potential new loan.

30.    Just eight days later, on September 13, 2018, CPIF sent a commitment letter for a $32 million loan that included a 3.5% origination fee to CPIF (which CPIF charged against the entire $32 million loan amount despite never fully funding the loan); a 3% "brokerage fee" to Eastern Union Funding; a 9.75% fixed interest rate; and a 12-month maturity. Although these fees were well above market rates, the Debtors did not even try to negotiate better terms, and CPIF was only too happy to take advantage of the Debtors' weak position.

31.    On September 14, 2018, Rob Shields at CPIF sent an email to Philip Carter, Kelly Carney, and James Frinzi at CFO (and included Will Nelson at CPIF and Mordechai Beren at Eastern Union Funding) saying that CPIF was "running full steam ahead to close before month end." Carter then looped in the Subsidiary Debtors' outside legal counsel Kimberly Davison at Griffith Davison.

32.    On September 18, 2018. James Frinzi sent a one-page summary to Rob Shields at CPIF regarding the TFF investigation in response to Shields's inquiry regarding

"preliminary findings" from background check, in which Frinzi described how Guess was perpetrating a fraud on innocent investors that involved businesses like the Carter entities: "The way the transaction worked was TFF would hold investment meetings, promoted on the radio, for retail investors. For example, he would rent a conference room at a hotel, and have Carter or someone like Carter, come and pitch the business for investment. Guess represented to the businesses that the retail investors were investing in a TFF debt fund, which would turn around and lend money to the business. Guess represented to the investors that the money was being invested directly to each organization as debt. What really happened was the investors would invest in an imposter organization, created by Bob Guess. That imposter company would then transfer the money to TFF. From there, TFF would lend the money to each of the actual companies, more or less as a corporate bond deal. The actual companies would then make the bond payments, and Guess would then use that cashflow to pay returns to the retail investors."

33.    Regardless of whether Carter's level of involvement in the scheme matched Frinzi's description, CPIF knew or should have known that Carter and his companies were in the middle of a criminal investigation as they were seeking to borrow millions of dollars from CPIF and offering security in assets in which defrauded individuals may have invested.

34.    During this truncated "due diligence" period, Kelly Carney emailed CPIF, explaining how the proceeds of the proposed $32 million loan FWC and MES were seeking could be used to help Carter and the Subsidiary Debtors either perpetuate or dig their way out of the scheme. For example, on September 21, 2018 Carney emailed Will

Complaint and Objection to Claim                                                    10

Nelson at CPIF: "And based on your pay back requirements then we will know what we have available each month for the TFF investors (there is no set amount, we just try and give people their money back as best and expeditious as we can)."

35.    And on September 25, 2018 Carney emailed Will Nelson and Rob Shields at CPIF outlining a repayment plan in which CPIF could be paid back quickly, while existing creditor–investors would be hindered and delayed in receiving payment: ". . . in theory you 32M could be paid back in Jan, and sales could fund the remainder of the projects and it still leaves a surplus to address the investor payout over the life of the projects. However, its construction, there are delays, sales don't always close when expected . . . I don't think we can ever build as fast as Carter wants to go...which requires capital vs phase approach. I am showing this spreadsheet as this is what Carter understands and looks at so w/e model loan structure needs to be on a monthly cash basis, showing how we could use your money to expedite CP and WM and finish much earlier, how we pay you back while keeping a surplus for the investor payout. Given the profits involved the sooner we finish the sooner Columbia and the investors are paid and we can use your money on the next projects." [spelling and grammar as in original].

36.    Later that same day, Rob Shields at CPIF responded favorably to Carney's proposal, copying Will Nelson: " . . . we are in the money deploying business and would like to provide as large of loan as possible, but we understand our debt is expensive and you want to control your costs." Carney replied to Shields and Nelson, casually informing them that he would like to pay back investors who had lost their life savings and had health problems, but only if doing so made sound business sense: " . . . the investor

proceeds are the thorn persay. Having heard their stories of lost life savings, health problems, if no surgery they are going to die, etc......you want to pay them back as soon as can or as many as can but it has to be business sound." [spelling and grammar as in original].

37.    Despite all of this information, CPIF forged ahead with the rush to close the transaction. On September 27, 2018 the parties exchanged signature packets, and CPIF's law firm Griffith Davison provided them with an opinion letter. Late in the evening of September 27, 2018, Rob Shields at CPIF emailed CFO's lawyer Kimberly Davison, copying Kelly Carney, and insisted that Griffith Davison change its opinion letter to include express representations regarding (1) the validity and perfection of the security interests being granted to CPIF under the loan agreements; (2) a representation that the interest rates being charged by CPIF were not usurious; and (3) that the firm was "not aware of any action, suit or proceeding, or investigation at law, or in equity, or before or by any court, public board or body, government agency or arbitrator, pending or threatened against, Borrower or Guarantor [i.e., Philip Carter], which challenges the validity or enforceability of or the transactions contemplated by the Transaction Documents, or the ability of Borrower or Guarantor to perform their respective obligations under any of such documents, or which seeks to enjoin the execution, delivery, or consummation of the transactions contemplated by such Transaction Documents." Griffith Davison had stricken that representation from its opinion letter because it knew, as CPIF knew, that it was false. Yet Shields requested it be put back into the letter.

Complaint and Objection to Claim                                                    12

38.    CPIF was so insistent on Griffith Davison including misleading representations in its opinion letter that CPIF's lawyer sent an email to Kimberly Davison again directing her to change the opinion letter. The email included a veiled threat: "If you need to bring in a different TX firm to provide the required opinions if you're firm isn't comfortable giving that's fine, but we need to have these in order to close."

39.    To their credit, Griffith Davison resisted the pressure from CPIF and its lawyers to include false representations in the opinion letter. Kimberly Davison responded to CPIF and its lawyer's demands late in the evening of September 27, 2018: "After receiving your comments, I discussed the requested opinions internally. While I can appreciate that other firms may be willing to provide the requested opinions, I believe your request far exceeds the typical opinions provided for transactions of this nature in Texas."

40.    CPIF was not pleased with Griffin Davison's response, and continued to pressure the firm to change the opinion letter before the now-delayed closing. On September 28, 2018 Griffith Davison finally relented and provided an updated opinion letter (the "**Opinion Letter**") referencing Bob Guess-related claims. Included in the final opinion letter was this representation: "Lender has performed its due diligence in connection with the transaction contemplated by the Transaction Documents in a reasonably prudent manner and has received, reviewed and duly considered all information available or obtained in connection with such due diligence or otherwise. Said due diligence included but was not limited to the following: (1) the search of public records, (2) the performing of background checks on the principals of Borrower and the Guarantors, (3) the visual inspection of the real property described in the Deed of Trust,

Complaint and Objection to Claim                                                    13

(4) the examination of all documents and information related to the Real Property and Personal Property including those provided by Borrower, and (5) all other information obtained or possessed by Lender or any agent or attorney for Lender."

41.     On September 28, 2018, CPIF closed on the $32 million loan transaction with Debtors FWC and MES (the "**CPIF Loan**"). Out of that $32 million, nearly $15 million was sent to TBG to pay off loans that these same Debtors and other Debtor entities had only recently obtained; another $960,000 went to Eastern Union Funding as a brokerage fee; $1.12 million went to CPIF as an origination fee; and another approximately $50,000 went to various other third parties. The high costs associated with the CPIF Loan—so soon after the Debtors had secured financing from TBG—left the Debtors in a worse financial condition than before the transaction.

42.     In connection with the CPIF Loan, CPIF executed certain loan and security documents with Carter, Debtors MES and FWC, and related entities that purported to give CPIF a first lien—ahead of the already-defrauded investors—on the very buildings and properties that Carter bought or developed in part with funds loaned by the investors (as identified, described, and defined in section 1.1. of the Opinion Letter and, together with the CPIF Loan and any disbursements made in accordance therewith, the "**CPIF Transfer**").

43.     Upon information and belief, CPIF neither sought nor obtained an opinion on the FWC's or MES's solvency before closing on the CPIF Loan and engaging in the CPIF Transfer.

44.     At the time of the CPIF Transfer, Debtors FWC and MES were insolvent.

45.    At the time of the CPIF Transfer, CPIF knew or should have known that Debtors FWC and MES were insolvent.

46.    At the time of the CPIF Transfer, Philip Carter, James Frinzi, and Kelly Carney were fiduciaries of Debtors FWC and MES.

47.    At the time of the CPIF Transfer, Philip Carter, James Frinzi, and Kelly Carney owed fiduciary duties to Debtors FWC and MES, and because Debtors FWC and MES were insolvent, those fiduciary duties extended to FWC's and MES's creditors.

48.    As a result of the CPIF Transfer, creditors of FWC and MES were hindered, delayed, or defrauded, and suffered harm. As recognized in the substantive consolidation of the Debtors' bankruptcy cases, such creditors included the defrauded investors.

49.    At the time of the CPIF Transfer, Philip Carter was the subject of state and federal criminal investigations.

50.    At the time of the CPIF Transfer, CPIF, Rob Shields, Brad Shain, and Will Nelson knew or should have known that Philip Carter was the subject of state and federal criminal investigations.

51.    In the weeks that followed the closing of the CPIF Loan and consummation of the CPIF Transfer, individuals at CPIF communicated with individuals at CFO regarding who should and should not receive payments out of the proceeds of the CPIF Loan. Included among the recipients of payments that CPIF knowingly approved and released were Philip Carter's criminal-defense attorney and creditors of entities that were not signatories to the CPIF Loan. CFO and CPIF also discussed the importance (to CPIF) of not paying investors without ensuring that CPIF was paid first.

Complaint and Objection to Claim                                                                          15

52.     For example, with respect to a planned closing in mid-October 2018 on the sale of Frisco Wade Crossing Retail Building No. 2, Unit 100, CPIF insisted that all sales proceeds be paid to CPIF despite Kelly Carney's request that at least some investors be paid some of what they were owed out of some of the sale proceeds. CPIF's insistence that it take control of all of the proceeds from the closing of this sale transaction hindered or delayed the payment of the Debtors' investor–creditors.

53.     After that transaction closed, CPIF and CFO continued to discuss who would get paid out of property sale proceeds, and how such payments would be determined, with CPIF claiming that it was entitled to take possession of 100% of the sale proceeds (while not applying these funds to the amounts owed under the loan) and control who got paid and when. On October 19, 2018, Kelly Carney emailed the following to Rob Shields at CPIF: "Ok so I am clear. We talked about a pay off schedule that was going to be put off until after closing and then 'worked out'. But you are stating there is a payoff schedule in the loan document? Especially given Mr. Carter was only sent the signature pages and not the full loan document to review…that would be a major problem. Regardless, I went thru all 100 pages of the loan document and I don't find any mention of Columbia keeping 100% of sales proceeds nor anything concerning disbursement that a lawyer would need to change. So before I go to Mr. Carter with this can you; 1. Point me to the page in the loan documents that shows a pay back schedule and 2. Explain why it would be in there when all discussions would be that payback would be discussed/agreed after closing." [spelling and grammar as in original].

54.    On November 2, 2018, CPIF funded a draw request by the Borrowers on the CPIF Loan in the aggregate amount of $1,536,662.16. None of this amount went to pay investors.

55.    Four days later, on November 6, 2018, the house of cards Carter had built (with CPIF's assistance) collapsed. Based on claims presented by the Texas State Securities Board, Carter was indicted by the Grand Jury of Collin County, Texas on multiple counts of securities fraud. Subsequently, the U.S. Securities and Exchange Commission also filed a complaint against Carter alleging that he and two other individuals raised approximately $45 million from more than 270 noteholders across the United States but that the "notes" were actually backed by unrelated, but closely named, entities that had no assets. The SEC also alleged that Carter misappropriated investor funds, using the funds to finance his own expenses, operate an Oklahoma ranch, and to pay certain investors to perpetuate the alleged fraudulent scheme.

56.    On the day Carter was indicted, Rob Shields at CPIF Lending emailed CFO's Kelly Carney regarding information needed for a discussed 80/20% sales-proceeds sharing agreement: "In regards to the 80/20 sales proceeds allocation. That is in your attorneys court, as we need to know the following before we can finalize the amendment:

> 1. Identity of the investors to whom amounts are owed, together with the amounts owed and the identity of the project in which the investors invested;
>
> 2. Identity of any pending lawsuits filed by any investor(s) against Phillip Carter and/or his entities where fraud, misrepresentation, breach of fiduciary duty, breach of contract, securities violations, and/or similar claims are asserted (please provide all case caption information);

3. Identify any pending civil or criminal actions asserted against Phillip
Carter or the borrower where a governmental unit is the plaintiff."

57.   Six days after Carter was indicted, on November 12, 2018, CPIF sent a letter

explaining CPIF's decision to hold on reserve the $2,889,842.82 in sales proceeds from two

mid-October sales of portions of Frisco Wade Crossing (the above-referenced sale of

Building No. 2, Unit 100 and another sale of Building No. 4) and commenting on

negotiations concerning allowing the Debtors to receive a partial distribution from the

proceeds of future sales.

58.   On November 14, 2018, CPIF sent a notice of default to CFO in which CPIF

identified the six state-level indictments against Phillip Carter and the federal

investigation. CPIF also notified CFO that the default interest rate would now be applied

to the outstanding balance on the CPIF Loan—including on amounts in reserve accounts

over which CPIF had custody and control. Astonishingly, in the notice of default CPIF

cited the representation (to the effect that the Debtors knew of no suits threatened

against any Borrower or Guarantor) that CPIF knew was false but had insisted the

Borrowers include in the Opinion Letter in order to close the CPIF Loan. *See* Complaint,

*supra*, ¶ 37.

59.   On November 20, 2018, CPIF sent a letter stating that it would authorize a draw

submitted on November 16, which requested payment of $1,019,918.21. None of the

amount requested, which CPIF authorized, went to pay investors.

60.   On November 30, 2018, CPIF funded yet another draw request by Borrowers in

the aggregate amount of $136,089.82. None of the amount requested and funded went to

pay investors. On December 5, 2018 CPIF paid itself a preferential payment in the amount

Complaint and Objection to Claim                                                          18

of $268,666.67 in Debtors' funds from an "Interest Reserve" account. On January 7, 2019 CPIF paid itself a preferential payment in the amount of $268,666.67 in Debtors' funds from an "Interest Reserve" account.

61.     On February 11 and 12, 2019, Kevin Quinn at CPIF sent an email to CFO regarding loan payoff amounts, asserting that $660,000 in alleged default interest (on top of $95,333 in regular interest) had accrued since November 14, 2018.

62.     On February 13, 2019, just four days before the Petition Date, CPIF sent CFO a notice of acceleration, stating that CPIF had applied $8,137,252.69 in Debtors' funds on deposit to antecedent debts owed to Debtors' creditors. Such applied funds included the $2,889,842.82 in sales proceeds held on reserve by CPIF since the mid-October Frisco Wade Crossing property sales.

63.     Postpetition, on November 8, 2019 CPIF filed an objection to the Trustee's motion for an order approving the sale of certain portions of Frisco Wade Crossing [*See* Docket No. 315], which the Court later overruled after notice and hearing [*See* Docket No. 325].

## IV.   CAUSES OF ACTION

### A.   *Cause of Action One: Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A) (Actual Fraud) and 11 U.S.C. §§ 550 & 551*

64.     The Trustee reincorporates the allegations contained in paragraphs 1 through 63 of the Complaint.

65.     The CPIF Transfer was made or incurred by MES and FWC within two years of the Petition Date and was made or incurred with actual intent to hinder, delay, or

defraud entities to which the MES and FWC were or became indebted after the date that such CPIF Transfer was made or such obligation was incurred.

66.    By reason of the foregoing, the Trustee sues to avoid the CPIF Transfer made to Defendant CPIF under 11 U.S.C. § 548, to recover the CPIF Transfer or the value thereof from Defendant CPIF under 11 U.S.C. § 550, and to preserve such avoided transfer and any liens associated therewith for the benefit of the Debtors' bankruptcy estate under 11 U.S.C. § 551.

### B.    *Cause of Action Two: Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(B) (Constructive Fraud) and 11 U.S.C. §§ 550 & 551*

67.    The Trustee reincorporates the allegations contained in paragraphs 1 through 66 of the Complaint.

68.    The CPIF Transfer was made or incurred by MES and FWC within two years of the Petition Date.

69.    MES and FWC received less than a reasonably equivalent value in exchange for such CPIF Transfer or obligations.

70.    MES and FWC were insolvent on the date of the CPIF Transfer or became insolvent as a result of the CPIF Transfer.

71.    As a result of the CPIF Transfer, creditors of the Debtors were harmed.

72.    By reason of the foregoing, the Trustee sues to avoid the CPIF Transfer made to Defendant CPIF under 11 U.S.C. § 548, to recover the CPIF Transfer or the value thereof from Defendant CPIF under 11 U.S.C. § 550, and to preserve such avoided transfer and any liens associated therewith for the benefit of the Debtors' bankruptcy estate under 11 U.S.C. § 551.

Complaint and Objection to Claim

### C.  Cause of Action Three: Fraudulent Transfer Under 11 U.S.C. § 544 and Texas Business and Commerce Code 24.005(a)(1) (Actual Fraud)

73.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 72 of the Complaint.

74.    Under 11 U.S.C. § 544(b)(1) the Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502.

75.    Under Texas Business and Commerce Code 24.005(a)(1), made applicable by 11 U.S.C. § 544(b)(1), the CPIF Transfer that was made by the Debtors was fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the CPIF Transfer was made or the obligation was incurred, as the Debtors made the CPIF Transfer with actual intent to hinder, delay, or defraud creditors of the Debtors.

76.    As a result of the CPIF Transfer, creditors of the Debtors were harmed.

77.    By reason of the foregoing, the Trustee sues to avoid the CPIF Transfer and to recover the CPIF Transfer or the value thereof from Defendant CPIF under 11 U.S.C. §§ 544 and 550, and for his attorneys' fees and costs.

### D.  Cause of Action Four: Fraudulent Transfer Under 11 U.S.C. § 544 and Texas Business and Commerce Code 24.005(a)(2) (Constructive Fraud)

78.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 77 of the Complaint.

79.    Under 11 U.S.C. § 544(b)(1) the Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under

applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502.

80.    Under Texas Business and Commerce Code 24.005(a)(2), made applicable by 11 U.S.C. § 544(b)(1), the CPIF Transfer that was made by the Debtors was fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the CPIF Transfer was made or the obligation was incurred, as the Debtors made the CPIF Transfer without receiving a reasonably equivalent value in exchange for the CPIF Transfer, and the Debtors: (A) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond the Debtors' ability to pay as they became due.

81.    As a result of the CPIF Transfer, creditors of the Debtors were harmed.

82.    By reason of the foregoing, the Trustee sues to avoid the CPIF Transfer and to recover the CPIF Transfer or the value thereof from Defendant CPIF under 11 U.S.C. §§ 544 and 550, and for his attorneys' fees and costs.

### E.  Cause of Action Five: Fraudulent Transfer Under 11 U.S.C. § 544 and Texas Business and Commerce Code 24.006(a) (Present Creditors)

83.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 82 of the Complaint.

84.    Under 11 U.S.C. § 544(b)(1) the Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under

applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502.

85.     Under Texas Business and Commerce Code 24.006(a) made applicable by 11 U.S.C. § 544(b)(1), the CPIF Transfer was fraudulent as to creditors whose claims arose before the CPIF Transfer because the Debtors made the CPIF Transfer without receiving a reasonably equivalent value in exchange for the CPIF Transfer and the Debtors were insolvent at that time or the Debtor became insolvent as a result of the CPIF Transfer.

86.     As a result of the CPIF Transfer, creditors of the Debtors were harmed.

87.     By reason of the foregoing, the Trustee sues to avoid the CPIF Transfer and to recover the CPIF Transfer or the value thereof from the Defendant CPIF under 11 U.S.C. §§ 544 and 550, and for his attorneys' fees and costs.

### F.   *Cause of Action Six: Fraudulent Transfer Under 11 U.S.C. § 544 and Texas Business and Commerce Code 24.006(b) (Present Creditors)*

88.     Plaintiff reincorporates the allegations contained in paragraphs 1 through 87 of the Complaint.

89.     Under 11 U.S.C. § 544(b)(1) the Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502.

90.     Under Texas Business and Commerce Code 24.006(b) made applicable by 11 U.S.C. § 544(b)(1), the CPIF Transfer was fraudulent as to creditors whose claims arose before the CPIF Transfer because the proceeds of the CPIF Transfer were used to pay an

antecedent debt of an insider, the applicable Debtors were insolvent at the time, and the insider had reasonable cause to believe that the applicable Debtors were insolvent.

91.    As a result of the CPIF Transfer, creditors of the Debtors were harmed.

92.    By reason of the foregoing, the Trustee sues to avoid the CPIF Transfer and to recover the CPIF Transfer or the value thereof from the Defendant CPIF under 11 U.S.C. §§ 544 and 550, and for his attorneys' fees and costs.

### G. *Cause of Action Seven: Aiding and Abetting Breach of Fiduciary Duty*

93.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 92 of the Complaint.

94.    On the date of the CPIF Transfer and during all relevant periods of negotiation of the terms of the CPIF Loan and CPIF Transfer, Debtors MES and FWC were insolvent.

95.    As a result of that insolvency, on the date of the CPIF Transfer and during all relevant periods of negotiation of the terms of the CPIF Loan and CPIF Transfer, Debtors MES's and FWC's officers, directors, managers, and principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi, had a fiduciary relationship with MES and FWC and with MES's and FWC's creditors, including the duty of good faith, the duty to always act in the best interest of MES's and FWC's creditors, and the duty to avoid self-dealing and self-enrichment at the expense of MES's and FWC's creditors.

96.    As described in this Complaint, one or more of MES's or FWC's officers, directors, managers, or principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi breached their fiduciary duties by, among other things, orchestrating, authorizing, and carrying out the CPIF Transfer.

Complaint and Objection to Claim                                                24

97.    CPIF knowingly and intentionally provided substantial assistance to Debtors MES's and FWC's officers, directors, managers, and principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi by, among other things, orchestrating, authorizing, and carrying out the CPIF Transfer.

98.    CPIF's assistance was a substantial factor in causing one or more of MES's or FWC's officers, directors, managers, or principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi to breach their fiduciary duties.

99.    These breaches of fiduciary duties proximately caused damages to the Debtors and their creditors in an amount to be proven at trial. Such damages were the reasonable and foreseeable outcome of CPIF's conduct. CPIF is liable for actual and consequential damages resulting from its conduct in aiding and abetting the breaches of fiduciary duties.

100.    As a result of the CPIF Transfer, creditors of the Debtors were harmed.

### H. Cause of Action Eight: Conspiracy to Commit Fraudulent Transfer

101.    Plaintiff reincorporates the allegations contained in paragraphs 1 through 100 of the Complaint.

102.    CPIF joined and conspired with one or more of Debtors MES's or FWC's officers, directors, managers, or principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi to perpetrate, facilitate, and aid or abet the CPIF Transfer, the breaches of fiduciary duties, and other wrongful acts that harmed the Debtors' creditors described in this Complaint.

103.   CPIF has a meeting of the minds with one or more of MES's or FWC's officers, directors, managers, or principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi regarding this course of action.

104.   As described in this Complaint, CPIF and one or more of Debtors MES's or FWC's officers, directors, managers, or principals, including without limitation Philip Carter, Kelly Carney, and James Frinzi undertook substantial wrongful overt acts in furtherance of this course of action.

105.   As a result of these wrongful acts, CFO and its creditors suffered damages in an amount to be determined at trial.

### I.  Cause of Action Nine: Avoidance and Recovery of Preferential Payments Under 11 U.S.C. § 547 and 550

106.   Plaintiff reincorporates the allegations contained in paragraphs 1 through 105 of the Complaint.

107.   CPIF, as a creditor of Debtors MES and FWC, received the benefit of transfers of interests in such Debtors' property on account of an antecedent debt (the CPIF Loan) while such Debtors were insolvent, which transfers were made between November 19, 2018 and the Petition Date (the "**Preference Period**"), and as a result of such transfers, CPIF was able to receive more than it would receive if such Debtors' cases were under Chapter 7 of the Bankruptcy Code, the transfers had not been made, and CPIF had received payment of such antecedent debts to the extent provided under the Bankruptcy Code.

108.    Specifically, and without limitation, CPIF received transfers of interests in Debtors MES's or FWC's property on account of antecedent debts on at least the following occasions and in the following amounts:

- December 5, 2018 in the amount of $268,666.67 (Debtors' funds in "Interest Reserve" that CPIF paid to itself);

- January 7, 2019 in the amount of $268,666.67 (Debtors' funds in "Interest Reserve" that CPIF paid to itself); and

- February 13, 2019 in the amount of $8,137,252.69 (Debtors' funds "on reserve" that CPIF paid to itself)

109.    Accordingly, the Trustee may avoid the Preferential Transfers under 11 U.S.C. § 547(b) and recover the value of the Preferential Transfers under 11 U.S.C. § 550(a).

## V.    OBJECTION TO CLAIM

110.    The Trustee objects to proof of claim number 457 filed by CPIF on October 16, 2019 in the amount of $24,788,078.18, plus certain postpetition fees, expenses, and interest (the "**CPIF Claim**"), and respectfully asks the Court to sustain this objection and disallow the CPIF Claim.

111.    The CPIF Claim arises from the CPIF Loan and the CPIF Transfer which, as described in paragraphs 1 through 100 above, consisted of a $32 million loan to Debtors FWC and MES that carried exorbitant fees and costs for which CPIF received a security interest in assets those Debtors had obtained during a fraudulent scheme facilitated by prepetition principals, managers, and agents of the Debtors.

112.    Although CPIF only ever made payments to the Debtors or to other parties on the behalf of the Debtors in an approximate total of $25.7 million, which included over

$2 million in broker and origination fees (the latter of which went to CPIF), CPIF uses the $32 million stated loan amount to calculate well over a million dollars of interest obligations (primarily at a default interest rate) it includes in the CPIF Claim. As a result and after the much-delayed application of over $2.8 million in proceeds from the mid-October 2018 sales of portions of Frisco Wade Crossing just before the bankruptcy filing, CPIF now asserts a claim of $24,788,078.18 as of the Petition Date. Upon information and belief, CPIF intends to assert an additional approximately $2 million in postpetition interest it asserts has been accruing at a rate of 18%, or $12,375.47 per day, since the Petition Date, as well as certain postpetition fees and expenses.

113.    As described in the Complaint, the CPIF Transfer was a fraudulent transfer under applicable bankruptcy and state law. Accordingly, the security interest granted by the Debtors in connection with the CPIF Transfer should be avoided. As a result of the avoidance of the security interest, to the extent CPIF has a claim against the Debtors' bankruptcy estate, such claim is not secured, so CPIF is not entitled to any postpetition interest.

114.    To the extent the security interest that might provide CPIF with the right to postpetition interest is not avoided, and the Court determines that CPIF is entitled to an allowed secured claim on which it is over-secured, the Court has discretion to allow postpetition interest at a rate other than the default interest rate CPIF is asserting. Provided the Court makes factual findings regarding the equities the Court considers in applying a different rate, the Court can, and should, disallow CPIF's assertion of default interest. For the reasons described throughout the Complaint and summarized below on

equitable subordination, CPIF's conduct justifies reducing—or denying entirely—postpetition interest on its claim.

115.    Additionally, to the extent that the Court determines CPIF is entitled to an allowed secured claim on all or a portion of its claim, the Court should surcharge CPIF's collateral under Bankruptcy Code § 506(c) for the work the Trustee has performed in the case relating to Frisco Wade Crossing, which was for the benefit of CPIF to the extent CPIF had a valid perfected security interest in the collateral whose value the Trustee's work preserved.

116.    If the Court finds in favor of the Trustee on any of the Chapter 5 causes of action asserted in the Complaint and orders recovery of the Debtors' property or the value thereof, the Court should disallow the CPIF Claim in its entirety under Bankruptcy Code § 502(d), unless CPIF actually turns over such property or the value thereof to the Trustee, in which event CPIF's claim should be limited to the amount recovered by the Trustee from CPIF for the Debtors' bankruptcy estate, in accordance with Bankruptcy Code § 502(h), and—for the reasons discussed below—be equitably subordinated to investor claims.

117.    Additionally or alternatively, to the extent the Court allows any portion of the CPIF Claim, either as a secured or unsecured claim, the Trustee respectfully asks the Court to equitably subordinate such claim under Bankruptcy Code § 510(c), which provides as follows:

> Notwithstanding subsections (a) and (b) of this section, after notice and hearing the court may--

> Under principles of equitable subordination, subordinate for purposes of distribution, all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to another allowed interest; or
>
> Order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

118.    To the extent the Court allows any portion of the CPIF Claim, that claim should be equitably subordinated because CPIF engaged in inequitable conduct through its involvement in, and facilitation of, a scheme to defraud investors. These acts caused significant and irreparable harm to numerous creditors.

119.    CPIF's inequitable conduct was willful, knowing, and deliberate. It included, without limitation, the following:

- Obtaining a security interest in assets that Debtors had acquired during a fraudulent scheme perpetrated by pre-petition principals, managers, and agents of the Debtors;

- Conspiring with the Debtors' pre-petition officers, directors, managers, or principals to effectuate the fraudulent CPIF Transfer and aiding abetting them in their breach of fiduciary duties;

- Charging exorbitant fees and interest on the CPIF Loan;

- Engaging in self-dealing to the detriment of the Debtors' creditors, including defrauded investors;

- Pressuring the pre-petition Debtors' outside legal counsel to make representations in an opinion letter that the firm repeatedly expressed their unwillingness to make;

- Ignoring numerous "red flags" about the Debtors' financial condition, stability, business relationships, and business practices, including the fact that the Debtors' principal Philip Carter was under criminal investigation by both state and federal authorities and his business associate had been indicted; the Debtors had been sued by Crossland; and the Debtors had recently obtained a

loan from another lender but were unhappy with the degree of review and oversight that lender was requiring; etc.;

- Deciding not to seek or obtain a solvency opinion despite the Debtors' obvious signs of financial distress;

- Failing to conduct adequate due diligence and rushing to close the transaction on an accelerated schedule;

- Exercising dominion and control over sales proceeds, keeping them on reserve instead of applying such proceeds to the CPIF Loan balance, so CPIF could charge default interest on a higher balance for months before applying the proceeds just a few days before the Debtors filed bankruptcy;

- Soon following the declaration of a default on November 12, 2018, refusing any draw requests but also refusing to accelerate the loan and apply the funds on reserve to the loan balance, instead charging default interest for months before finally accelerating the loan and applying the reserves just before bankruptcy;

- After Philip Carter was indicted, making preferential payments to itself by transferring the Debtors' funds on reserve in the amounts of $268,666.67 each on December 5, 2018 and January 7, 2019, and in the amount of $8,137,252.69 just days before the Debtors filed bankruptcy, despite knowing that these funds were needed to pay defrauded investors;

- In calculating interest on the CPIF Claim, applying a usurious interest rate above the maximum amount allowed under Texas law through the use of a 360-day year for interest calculation;

- In applying a 3.5% "origination fee" on the CPIF Loan, applying the fee to the $32 million loan amount despite never fully funding the loan; and

- In releasing funds, paying third parties not directly involved in the construction for which the loan was ostensibly obtained, such as Carter's defense attorney and other personal creditors of Carter.

120.    Equitably subordinating any allowed claims of CPIF to the claims of the defrauded investors is fair based on the totality of the circumstances in this case.

121.    Equitably subordinating any allowed claims of CPIF to the claims of the defrauded investors is consistent with Bankruptcy Code.

122.    Accordingly, to the extent any of CPIF's claims are not otherwise disallowed by this Court, the Trustee is entitled to entry of an order equitably subordinating all such allowed claims of CPIF to the claims of the defrauded investors against the Debtors.

## VI. PRAYER

**WHEREFORE, PREMISES CONSIDERED**, David Wallace, Trustee, respectfully prays that this Court:

a) Enter judgment in the Trustee's favor on all cause of action asserted in this Complaint;

b) avoid the CPIF Transfer described in this Complaint in accordance with §§ 544 or 548, as applicable, including but not limited to any security interests granted by any of the Debtors to CPIF in connection with the CPIF Loan;

c) order the Defendant to turn over to the Trustee the value of such CPIF Transfer under § 550 of the Bankruptcy Code;

d) order the Defendant to turn over to the Trustee the value of the Preferential Transfers under § 550 of the Bankruptcy Code;

e) direct that the CPIF Transfer and any liens associated therewith are preserved for the benefit of the estate under § 551 of the Bankruptcy Code;

f) find and conclude that Plaintiff aided and abetted a breach of fiduciary duty, and award damages in an amount to be determined at trial;

g) find and conclude that Defendant conspired to commit a fraudulent transfer, and award damages in an amount to be determined at trial;

h) sustain the Trustee's objection to CPIF's proof of claim and, to the extent the Court finds that CPIF has a claim against the estate in any amount, equitably subordinate the allowed amount of such claim to the allowed claims of the defrauded investors;

i) to the extent the Court determines that CPIF has an allowed secured claim in any amount, deny CPIF's request for postpetition interest entirely or, to the extent the Court determines that CPIF is entitled to postpetition interest, deny CPIF's request for interest at the default rate and reduce the rate of interest to a lower rate based on equitable considerations;

j) to the extent the Court finds that CPIF has an allowed secured claim in any amount, under 11 U.S.C. § 506(c) permit the Trustee to recover from the property securing CPIF's allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to CPIF, in an amount to be determined at trial;

k) disallow CPIF's claim for both pre-petition or postpetition attorneys' fees and costs;

l) award the Trustee attorneys' fees, costs, and prejudgment and post-judgment interest to the fullest extent permitted by law;

m) grant such other relief to the Trustee as the Court may deem just and equitable.

Dated:  April 30, 2020                    By:  /s/          Judith W. Ross
                                          Judith W. Ross, State Bar No. 21010670
                                          Frances A. Smith, State Bar No. 24033084
                                          Eric Soderlund, State Bar No. 24037525
                                          Jessica L. Voyce Lewis, State Bar No. 24060956
                                          **Ross & Smith, PC**
                                          700 N. Pearl Street, Suite 1610
                                          Dallas, Texas 75201
                                          Telephone: 214-377-7879
                                          Facsimile: 214-377-9409
                                          Email: judith.ross@judithwross.com
                                                 frances.smith@judithwross.com
                                                 eric.soderlund@judithwross.com
                                                 jessica.lewis@judithwross.com

                                          **COUNSEL TO CHAPTER 11 TRUSTEE
                                          DAVID WALLACE**