## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO:    19-40426 |
| | § | |
| CFO MANAGEMENT HOLDINGS, LLC, | § | CHAPTER 11 |
| | § | |
| DEBTOR. | § | |
| | § | |
| DAVID WALLACE, Chapter 11 Trustee for | § | ADVERSARY NO. 20-04054 |
| the Bankruptcy Estate of CFO Management | § | |
| Holdings, LLC, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | |
| | § | |
| CPIF LENDING, LLC, a Washington Limited | § | |
| Liability Company, | § | |
| | § | |
| DEFENDANT. | § | |

### CPIF LENDING, LLC'S MOTION TO DISMISS CHAPTER 11 TRUSTEE'S
### COMPLAINT AND OBJECTION TO CLAIM

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING *WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE* SHOWN IN THE CERTIFICATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION.  IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT.  IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING WITH APPROPRIATE NOTICE.  IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN.  THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

TO THE HONORABLE BRENDA T. RHOADES, CHIEF U.S. BANKRUPTCY JUDGE:

Defendant CPIF Lending, LLC ("CPIF"), by and through undersigned counsel, moves (the

"Motion to Dismiss" or "Motion") this Court for an Order dismissing with prejudice the *Complaint*

1

*and Objection to Claim* [AP Docket No. 1][1] (the "Complaint") filed against it by Plaintiff David Wallace in his capacity as the chapter 11 trustee for the substantively-consolidated bankruptcy estate of CFO Management Holdings, LLC (the "Trustee" or "Plaintiff"). In support thereof, CPIF respectfully states as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

2.    Venue of this Adversary Proceeding, only in the event that it should not be dismissed, is properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought by this Motion are Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012.

## II.    BACKGROUND

4.    CPIF is a lender. Compl. ¶ 36. It regularly works with real estate development and holding companies to fund construction projects. It is through this lending relationship that CPIF became involved with two of the Debtors,[2] Frisco Wade Crossing Development Partners, LLC ("FWC") and McKinney Executive Suites at Crescent Parc Development Partners, LLC ("MES" and together with FWC, the "Borrowers")). Compl. ¶ 28.

5.    FWC, MES, and CPIF were parties to that certain *Construction Loan Agreement*, dated as of September 27, 2018, whereby CPIF loaned the Borrowers $32 million to fund

---

[1] References herein to documents filed in (i) this adversary proceeding will be cited as "[AP Docket No. ___]," (ii) the main proceeding, *In re CFO Management Holdings, LLC*, Case No. 19-40426, will be cited as "[Main Case Docket No. ___]," and (iii) adversary proceeding no. 19-04096, *Wright v. Wallace*, will be cited as "[Class-Action Docket No. ___]."

[2] Currently, there is only a singular, substantively-consolidated bankruptcy estate. For ease of reference to the historical background, however, this Motion may refer to the multiple *Debtors* as existed prior to the consolidation, depending on the context.

construction on two real estate development projects. Compl. ¶¶ 41, 42. Nearly $15 million of the CPIF Loan went to refinance the Borrowers' existing lender, with the remainder used to pay operational expenses and closing fees. Compl. ¶ 41.

6.      Unfortunately, the Borrowers' indirect owner, Phillip Carter ("Carter"), was also operating a Ponzi scheme using entities with names similar to those of the Debtors, and the fallout from that scheme landed the Debtors and their legitimate business operations in bankruptcy. Compl. ¶¶ 6, 16, 58 (indictment against Carter was factual basis for multiple events of default under the CPIF Loan).

7.      The way the scheme purportedly worked, Carter, along with a charismatic radio personality, Bob Guess, and Guess's company, Texas First Financial ("TFF"), would pitch potential investments to individuals. Compl. ¶ 17.  After hearing promises from Carter and Guess regarding the riskless nature of the investments, the individuals would purchase unsecured notes from various shell companies that were "misleadingly named to confuse investors." *Id.*

8.      Through this fraud, Carter and Guess raised over $40 million by selling unsecured notes to approximately 270 individuals. Compl. ¶ 16.

9.      According to the noteholders, Carter and Guess represented that the notes would be backed by the real estate owned by the Debtors. Compl. ¶ 17-19. In reality, the notes were, on their face, unsecured, and the Debtors had no legal relationship to the notes beyond the common connection of Carter. Compl. ¶ 18, 19. In fact, it's unclear exactly how noteholder funds were used, beyond the fact that Carter did use over $1 million of noteholder funds to retire a personal tax lien and support his personal lifestyle. *See* Compl. ¶ 16.

10.     Of note, the Complaint makes no allegation linking FWC or MES to the Carter scheme. There are no allegations suggesting that FWC or MES issued notes, that entities with similar names to FWC or MES issued notes, or that FWC or MES received any noteholder funds.

11.     Still, CPIF did discover an active investigation involving TFF and Guess (and linking Carter) as part of its due diligence process, which prompted CPIF to request and receive a summary of the investigation into TFF from its Borrowers in September 2018. Compl. ¶ 31. According to the Borrowers, Carter was an innocent participant in a Ponzi scheme orchestrated by Guess. Compl. ¶ 32 (stating that Carter would attend pitch meetings and would then negotiate funding from TFF by having his legitimate businesses issue bonds to TFF).

12.     Prior to closing the CPIF Loan, and consistent with market practice, CPIF insisted on a legal opinion from the Borrowers' counsel, which CPIF believed needed to include an opinion that the Borrowers and Carter were not subject to any legal action or investigation. Compl. ¶ 37.

13.     After negotiations, CPIF did receive a legal opinion from the Borrowers' outside counsel, Griffith Davison, stating that the firm was "not aware of any action, suit, or proceeding before any court, public board[,] government agency or arbitrator which challenges the validity or enforceability of the transaction contemplated by the Transaction Documents or the ability of Borrower or Guarantor [(i.e., Carter)] to perform their respective obligations."[3]

14.     Shortly after the CPIF Loan closed, Carter was indicted in Texas. Compl. ¶ 55. By early November, Carter was facing charges by Texas state authorities and the SEC. *Id.*

---

[3] There appears to be some confusion in the Complaint regarding the contents of the legal opinion, as Paragraph 40 of the Complaint states that there is a *representation* from CPIF regarding its diligence efforts. That is incorrect. CPIF did not sign the Opinion Letter; the discussion of CPIF's diligence is an *assumption* included in the Opinion Letter. *See* Opinion Letter, attached hereto as <u>Exhibit A</u>. Note that courts may take judicial notice of a document whose contents and accuracy are not in dispute. *See* Fed. R. Civ. P. 201.

15.     In response to the charges, CPIF sent a notice of default under the CPIF Loan.

Compl. ¶ 58. Shortly thereafter, the Debtors filed for bankruptcy protection.

16.     Procedurally, the bankruptcy case appears to be largely focused on litigation of

CPIF's claim against the Borrowers (which culminated in this adversary proceeding and a recently-

proposed chapter 11 plan filed by the Trustee) and litigating the rights of the noteholders (which

is, at least in part, being litigated before this court in Adversary Proceeding No. 19-04096, brought

by a putative class of noteholders seeking a constructive trust over all of the assets of the

substantively-consolidated Debtor, referred to as the "Class-Action Adversary").

## III.     RELIEF REQUESTED AND LEGAL STANDARDS

17.     As set forth in more detail below, the Complaint fails to adequately allege a

plausible claim for recovery and therefore should be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(6), incorporated into this matter by Federal Rule of Bankruptcy Procedure 7012.

18.     "[W]hen considering a motion to dismiss for failure to state a claim, the court must

'accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff.'"

*Rodriguez v. Cyr (In re Cyr)*, 602 B.R. 315, 323 (Bankr. W.D. Tex. 2019) (quoting *Thompson v.*

*City of Waco, Texas*, 764 F.3d 500, 502–03 (5th Cir. 2014). However, courts need only consider

factual allegations that provide substance to a complaint and should ignore "threadbare recitals of

a cause of action's elements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Once a court has

identified the substantive factual allegations, a complaint should be dismissed unless the well-

pleaded facts have crossed "the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007).

19.     To the extent a complaint alleges actual fraud, the pleading standard is heightened:

under Fed. R. Civ. P. 9(b) ("Rule 9(b)"), allegations of actual fraud must include the "who, what,

when, where facts" about the fraudulent conduct.  The Fifth Circuit "interprets Rule 9(b) strictly,

requiring a plaintiff pleading fraud 'to specify the [actions] contended to be fraudulent, identify the [actor], state when and where the [actions] were made, and explain why the [actions] were fraudulent.'" *Herrman Holdings Ltd. v. Lucent Techs. Inc*., 302 F.3d 552, 564-65 (5th Cir. 2002).

20.     Because the Trustee has failed to identify any plausible causes of action—presenting instead an implausible, internally inconsistent theory based on the idea that CPIF somehow participated in the Carter scheme—the Complaint should be dismissed.

## IV.    <u>LEGAL ARGUMENT</u>

21.     The bulk of the Complaint focuses on the misdeeds of Carter and Guess: how they misled individuals and bilked them out of their life savings, only to use the funds to support a lavish lifestyle and keep the Ponzi scheme going. *See* Compl. ¶ 16.

22.     Very little discussion is given to CPIF, the actual defendant targeted by the Trustee's complaint. Most of the well-pleaded facts about CPIF are basic facts that would apply to almost any loan transaction: CPIF presented itself as an appealing partner during the term-sheet phase of negotiations (Compl. ¶ 31), pushed back on various terms during the documentation phase (Compl. ¶¶ 37, 53 (during negotiations, there was an open business point regarding required prepayments)), and eventually become a more aggressive partner as the Borrowers entered into a workout situation (Compl. ¶¶ 57, 60, 62).

23.     This imbalance between the volume of allegations against Guess and Carter, on the one hand, and CPIF on the other, reflects the overall flaw with the Complaint: the bad acts were committed by Carter and Guess while CPIF, like all the other creditors, was simply caught in the fallout.

24.     Nothing in the Complaint suggests that CPIF knew the extent of Carter's involvement in the TFF scheme, and nothing in the Complaint suggests that CPIF's Borrowers were involved at all. Instead, the Complaint simply asserts, with no evidence, that CPIF should

have known that Carter was more involved in the fraudulent scheme, even though CPIF received a legal opinion from a respected Dallas law firm stating that the Borrowers and Carter were not involved in any legal proceedings. Moreover, the Complaint does not allege that the Borrowers were in default under their existing loan from their prior lender (TBG Fund, LLC) due to Carter's scheme.

25. In other words, the Complaint suggests that CPIF should have known more about the Carter scheme than the Debtors' outside counsel and the Borrowers' existing lender.

26. Similarly, even though the Trustee has been in place for over a year—and thus had the benefit of the Debtors' books and records and access to otherwise privileged information—he has been unable to directly link the Borrowers to the Carter scheme. Yet he expects CPIF, an outside lender, to have been able to identify those risks during a due diligence period where Carter was still actively attempting to keep the Ponzi scheme going.

27. Likewise, the Complaint does not present a coherent theory on why CPIF would involve itself the Carter scheme or how it would benefit from such participation. In fact, the Complaint suggests that, if anything, CPIF was an impediment for Carter keeping the Ponzi scheme going because CPIF insisted that the funds of its Borrowers be used to pay the obligations actually owing by the Borrowers and not the purported investors/noteholders. *See* Compl. ¶ 56 (CPIF requiring documentation regarding the amounts owed to noteholders and on what basis).

28. Instead, the Complaint seems to hope that the misdeeds of Carter and Guess will create enough smoke to suggest that CPIF is the source of the fire. Not so, and the Complaint seems to admit that disconnect by failing to link CPIF to the fraudulent scheme or even explain how CPIF was beneficial to Carter and Guess's scheme.

29.     Indeed, as discussed in more detail below, each of the three major theories of recovery against CPIF set forth in the Complaint—(1) fraudulent transfer liability based on a theory of actual fraud; (2) fraudulent transfer liability based on a constructive fraud theory; and (3) preference liability based on CPIF applying its collateral to the debt owed by its Borrowers—fails to make any sense when examined with any scrutiny.  None of these theories are plausible given the actual allegations of the Complaint.

30.     First, the Complaint fails to present any plausible theory of actual fraud; in fact, the trustee's allegations regarding CPIF's involvement in the Carter scheme contradict the proposed theory of liability. The Complaint argues that CPIF was a knowing and willing participant in the Carter scheme (Compl. ¶ 102), yet also alleges that CPIF refused to permit its collateral to be used to pay the noteholders who were allegedly defrauded (Compl. ¶ 52).  The Complaint fails to present any coherent theory on how CPIF was useful to the Carter scheme, given that the only allegations regarding CPIF's involvement suggest that CPIF was not compliant with the atypical requests coming from its Borrowers. Compl. ¶ 52 (CPIF refuses to fund payments to purported investors/noteholders); ¶ 56 (CPIF requiring additional information on the legal relationship between purported investors/noteholders and construction projects before agreeing to let collateral proceeds to be used to pay those noteholders). It's unclear how CPIF's refusal to participate in efforts to keep the Carter scheme funded is evidence of its intent to participate in said scheme.

31.     Second, the Complaint fails to adequately allege facts related to constructive fraud. There are zero factual allegations regarding the insolvency or financial condition of the Borrowers at the time(s)[4] of the CPIF Transfer (as defined in the Complaint), with the Trustee merely stating

---

[4] As discussed in more detail below, the Complaint appears to target various payments made by the Borrowers to unrelated third parties, seeking liability against CPIF because those payments were funded, at least in part, with proceeds of the CPIF Loan. There does not appear to be a clear legal basis for this theory of recovery.

the legal conclusion that FWC and MES were insolvent. Compl. ¶ 44. In addition, the Complaint does not adequately allege that FWC and MES failed to receive reasonably equivalent value for the CPIF Transfer, though this is likely because the granting of security interests in connection with a third-party loan is almost always a transfer supported by reasonably equivalent value. *See First Nat'l Bank of Seminole v. Hooper*, 104 S.W.3d 83, (Tex. 2003) ("We must decide whether such a transfer [of a security interest] can support a claim for constructive fraud under the Texas Uniform Fraudulent Transfer Act absent evidence that the transferee intended to assist the debtor in evading his creditors. We hold that it cannot because, as a matter of law, the value of the interest in an asset transferred for security is reasonably equivalent to the amount of the debt that it secures.").

32.      Finally, the Complaint fails to set forth a plausible path to recovery on the payments that occurred during the preference period. It is well-established that payments from collateral, regardless of whether a creditor is fully secured or undersecured, cannot result in a preference. *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LP)*, 171 F.3d 249, 254 (5th Cir. 1999) ("[A] creditor who recovers his own collateral is not deemed to have recovered a greater percentage than he would have in bankruptcy. Similarly, an undersecured creditor who receives prepetition payments does not receive a greater percentage recovery when the source of the payments is the creditor's own collateral."). Given that the Complaint alleges that the identified payments were all made by CPIF applying funds it held in reserves established by the underlying loan documents (and that CPIF had control over), the Complaint itself establishes that CPIF cannot have any preference liability for such payments. Compl. ¶ 108.

33.      The remaining counts contain similar flaws in that they all rely on an implausible theory whereby CPIF worked in concert with the Carter scheme all while refusing to do the bidding

of Carter and his employees. Because the Complaint fails to provide substantive allegations
regarding CPIF's involvement in the Carter fraud and fails to present meaningful facts regarding
constructive fraud, the Complaint must be dismissed.

**A.    Counts 1 and 3 Do Not Plausibly Allege any Participation by CPIF in Carter's
Allegedly Fraudulent Scheme**

34.    Counts 1 and 3[5] allege actual fraud in connection with the closing of the CPIF Loan
and disbursements under the CPIF Loan. Count I is brought under 11 U.S.C. § 548(a)(1)(A), which
requires a showing that the debtor-transferor made the target transfer with "actual intent to hinder,
delay, or defraud" creditors of the debtor-transferor. 11 U.S.C. § 548(a)(1)(A). Count III is being
pursued under Tex. Bus. & Com. § 24.005(a)(1), which also requires a finding of actual intent to
hinder, delay, or defraud a creditor of the debtor-transferor.

35.    Although the Fifth Circuit has not determined whether the heightened pleading
requirement under Rule 9 applies to fraudulent transfer actions alleging actual fraud, the majority
view is that Rule 9 applies to fraudulent transfer claims alleging actual fraud. *See Cyr*, 602 B.R. at
326; *Official Comm. of Unsecured Creditors v. Amer. Tower Corp. (In re Verestar, Inc.)*, 343 B.R.
444, 459-60 (Bankr. S.D.N.Y. 2006).

36.    A complaint can show a plausible allegation of actual fraud by setting forth multiple
badges of fraud. *Cyr*, 602 B.R. at 329 ("[M]ore than one badge of fraud must be shown to establish
actual fraudulent intent."). Those badges are:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close
> associate relationship between the parties; (3) the retention of possession, benefit
> or use of the property in question; (4) the financial condition of the party sought to
> be charged both before and after the transaction in question; (5) the existence or
> cumulative effect of the pattern or series of transactions or course of conduct after

---

[5] The Complaint uses both letters and numbers to identify different causes of action. This Motion refers to those causes
of actions as numbered counts. Therefore, "A. Cause of Action One: Fraudulent Transfer Under 11 U.S.C. §
548(a)(1)(A) (Actual Fraud) and 11 U.S.C. §§ 550 & 551" is referred to as "Count 1."

the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Id.*[6]

37.    Here, the Complaint fails to allege any badges of fraud. The security interests granted to CPIF were directly tied to the loans advanced by CPIF and therefore were supported by consideration. CPIF is not an insider of any of the Debtors, and the Complaint contains no allegations that there was a prior relationship between CPIF and Carter or the Debtors. Although the Borrowers retained their pledged assets, they no longer had full control over the assets pledged as collateral, as CPIF was granted valid liens and enforced those liens. Compl. ¶ 52 (CPIF insisted on being repaid with the proceeds of its collateral).  Likewise, the Complaint fails to include any allegations regarding the financial position of the parties beyond conclusory allegations that the Debtors were insolvent (which is not a properly pleaded fact, *see infra* Part IV.B.2) or any allegations regarding how the CPIF Loan advanced any fraudulent scheme or was otherwise connected with any of Carter's alleged misdeeds.[7]

38.    Turning to the longer list of badges under the Texas statute, the Complaint again fails to capture a single badge of fraud. For example, the CPIF Loan was far from concealed, as

---

[6] Tex. Bus. & Comm. § 24.005(b) sets forth nearly identical badges of fraud for determining actual intent: "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

[7] Perhaps one of the reasons the Complaint fails to make this connection is because the Trustee lacks evidence showing that any noteholder funds flowed into the Borrowers and their construction projects. *See Defendant's Original Answer* [Class-Action Docket No 45], filed by the Trustee, ¶ 19. Note that courts considering a motion to dismiss may take judicial notice of proceedings and records in cases before the same court. *Cyr*, 602 B.R. at 347.

CPIF filed mortgages and UCC-1 financing statements with the appropriate recording offices that would have been disclosed in any typical lien search. *See* Proof of Claim No. 457 (CPIF's proof of claim, attaching file-stamped security filings).[8] Likewise, the Complaint makes no allegations that FWC or MES were subject to any lawsuit before or after the CPIF Loan closed, merely that Carter was apparently under investigation. Compl. ¶¶ 37, 40 (prior to closing the CPIF Loan, CPIF received a legal opinion from Griffith Davison that stated that the firm was "not aware of any action, suit or proceeding" against "Borrower or Guarantor"), 49. The Complaint contains no allegations about the Borrowers absconding, concealing assets, or incurring "a substantial debt" before or after closing the CPIF Loan. There are also no allegations that CPIF transferred any essential assets to an insider of the Debtors.

39.     In short, the Complaint simply does not lay out a reasonable theory of fraud involving CPIF. There are no allegations that CPIF was aware of the extent of Carter's involvement in the fraud or that CPIF provided any direct support to the fraud. *See, e.g.*, Compl. ¶ 32 (CPIF receives a summary of the fraud scheme that suggests Carter was an innocent participant in investor pitch meetings); ¶ 41 (nearly half of the CPIF Loan refinanced an existing third-party lender); ¶ 33 (allegation making a bald assertion that, notwithstanding the diligence materials CPIF received to the contrary, "CPIF knew or should have known that Carter and his companies were in the middle of a criminal investigation").

40.     The Complaint seems to focus on the fact that CPIF was unwilling to fund payments to noteholders even though there was no legal connection between the noteholders and CPIF's

---

[8] Courts considering a motion to dismiss may take judicial notice of proceedings and records in cases before the same court. *Cyr*, 602 B.R. at 347.

Borrowers.[9] Compl. ¶ 18 (describing how the investors purchased notes from entities with no underlying assets, not the actual operating entities). It's unclear exactly how CPIF's unwillingness to "play ball" with Carter is indicative of CPIF's participation in Carter's fraud, but that appears to be the primary argument made by the Trustee.

41.    To the extent that the Trustee is attempting to avoid payments made using proceeds of the CPIF Loan, the Trustee has failed to name the correct defendant. *See* Compl. ¶ 24 (defining "CPIF Transfer" as the granting of liens in connection with the CPIF Loan as well as "any disbursements made in accordance" with the CPIF Loan). Both 11 U.S.C. § 548 and Tex. Bus. & Com. § 24.005 focus on avoiding transfers such that the *transferee* becomes liable. *See* 11 U.S.C. § 550(a) (setting forth the liability of transferees); Tex. Bus. & Com. § 24.009(b) (judgments may be entered against transferees of a debtor's assets).

42.    The Complaint does not identify any particular disbursements that it seeks to avoid under Counts 1 and 3, but, to the extent the Trustee is seeking to avoid payments to third parties, those third parties are the proper defendants, not the funding lender. *See Buchwald Cap. Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 447 B.R. 170, 187 (Bankr. S.D.N.Y. 2011) (explaining that, in order to collapse a transaction and attack funding lenders for fraudulent transfer liability, the complaint must allege that (i) "the consideration [i.e., the loan proceeds] received from the first transferee [i.e., the lender] must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors" and (ii) "the initial transferee must have actual or constructive knowledge of the entire scheme that renders the exchange with the debtor fraudulent.") (internal citations omitted). Failure to show that the funding

---

[9] One can imagine that, had CPIF funded payments to those noteholders, the Trustee would now be seeking to avoid such payments as lacking reasonably equivalent value, since the Borrowers did not owe any obligations to such noteholders.

lender "was intimately involved in the formulation or implementation of the plan by which the proceeds of the loan were channeled to [a] third-party" is fatal to complaints seeking to avoid loan disbursements as fraudulent. *Id.* Likewise, a complaint must identify specific transactions for avoidance, linking specific loan disbursements to subsequent and intimately connected fraudulent transfers. *Id.* at 190 ("The [Plaintiff] essentially alleges that the Lending Banks made advances to the debtors during a four year period, some but not all of the advances were fraudulently transferred to [affiliates], and each Lending Bank knew or should have known that its advance would be fraudulently transferred. [T]he [Plaintiff] makes no attempt to allege that a particular Lending Bank made a specific advance that was subsequently reconveyed fraudulently with that Lending Bank's knowledge or consent. In short, the [Plaintiff] fails to allege that any Lending Bank made a specific loan that caused an injury to the debtors. Instead, it attempts to cast the burden of disproving the tortious conduct onto the Lending Banks.").

43.     Here, the Complaint does not identify any specific transaction outside of an allusion to CPIF approving payments to "Philip Carter's criminal-defense attorney and creditors of entities that were not signatories to the CPIF Loan." Compl. ¶ 51. There is no further information regarding those payments nor does the Complaint state whether CPIF loans were used to fund such payments, who the payees were, or when such payments occurred. As in *Fabrikant*, the general allegations of the Complaint—that CPIF made loans to the Borrowers during a period when Carter was orchestrating fraudulent scheme using affiliated entities—are not sufficient to collapse any CPIF loan disbursements into any subsequent fraudulent transfers. Even without application of Rule 9, the failure to at least identify the allegedly fraudulent payments that the Trustee believes were funded with CPIF loan proceeds would appear to be insufficient pleading.

14

44.     The Complaint fails to present any factual allegation that supports the idea that CPIF knew about Carter's involvement in any fraud. If anything, the Complaint suggests that CPIF was not a participant in the fraud, as CPIF frequently refused to move forward with the loan closing or subsequent disbursements without additional information or diligence regarding the fraud allegations. The Complaint also fails to explain how the CPIF Loan did anything to advance Carter's alleged scheme, given that the Complaint includes no allegations connecting the finances of the Borrowers and the entities the defrauded investors purchased notes from. Due to the Complaint's failure to identify a single badge of fraud or explain "who, what, where, when and how" the CPIF Loan hindered or delayed any creditors, it fails to state a claim for actual fraud. Counts 1 and 3 should be dismissed.

**B.     Counts 2, 4, and 5 Lack Legal and Factual Bases for Relief on a Constructive Fraud Theory**

45.     Counts 2, 4, and 5 are all fraudulent transfer allegations based on constructive fraud. Count 2 is brought under 11 U.S.C. § 548(a)(1)(B), Count 4 is brought under Tex. Bus. & Com. § 24.005(a)(2), and Count 5 is brought under Tex. Bus. & Com. § 24.006(a).

46.     In each case, a trustee must show that the debtor-transferor (A) did not receive reasonably equivalent value in exchange for the transfer and (B) was insolvent at the time of the transfer.[10] Because granting a lien to secure a bona fide loan cannot be constructively fraudulent and because the Complaint fails to include a single factual allegation regarding the Borrowers' financial state, there is no plausible allegations for any of the three constructive fraud claims.

---

[10] 11 U.S.C. § 548(a)(1)(B) and Tex. Bus. & Com. § 24.006(a) specifically require findings of insolvency. Tex. Bus. & Com. § 24.005(a)(2) requires a showing that either the debtor had unreasonably small capital or assets in relation to its business or was incurring debts beyond its ability to pay as they came due. Given the similarity of the standards involved and the Complaint's complete lack of factual allegations regarding the financial status of the Borrowers, for purposes of this Motion, each of these requirements, though slightly different, can be treated as a single "insolvency" requirement.

1.    **Granting a Lien in Connection with an Arms'-Length Loan is Never Constructively Fraudulent**

47.    "[T]he securing of a loan concurrent with its funding cannot be a fraudulent transfer, even if the amount of the security exceeds the amount of the debt being secured."  5 Collier on Bankruptcy ¶ 548.03[5] (16th ed.); *see also Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 323 B.R. 838, 841-42 (Bankr. S.D.N.Y. 2005) ("This Court there held that when a debtor grants a security interest to a lender in respect of antecedent debt, the debtor must necessarily receive reasonably equivalent value or fair consideration in exchange. This Court also noted that the value of the collateral was not relevant in determining whether the debtor received reasonably equivalent value in exchange for its granting the security interest, because the rights of a secured creditor in collateral are always restricted by the amount of the debt.").  Using a similar analysis, the Texas Supreme Court has found that the Texas Uniform Fraudulent Transfer Act does not permit constructive fraud liability for the granting of a lien to secure antecedent debt because such a lien grant only provides a security interest to the extent of the underlying debt. *See Hooper*, 104 S.W.3d at 83. In other words, the security interest will always match the entire amount of the underlying debt, so there is always equivalent value. *Id.*

48.    Here, the Complaint concedes that the Borrowers granted a security interest to CPIF in exchange for a $32 million loan and that the Borrowers received, at least, $25.7 million in payments to the Debtors or to other parties on the Debtors' behalf.  *See* Compl. ¶¶ 41, 112. *See also* Proof of Claim 457 (showing that CPIF's secured claim is tied directly to funds that have been advanced to the Borrowers). As a matter of law, the Complaint cannot show that the granting of liens in favor of CPIF was constructively fraudulent.

49.    Similarly, the Trustee may not avoid a loan transaction based on the "high costs associated with the CPIF Loan" so long as the Borrowers received value for the transaction. *See*

16

*In re Summit Place, LLC)*, 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002) (evaluating a bridge loan that

included expensive fees). In *Summit*, the court noted that, in addition to the actual funds disbursed

by the bridge lender, the refinancing nature of the transaction—which allowed the borrower-debtor

to avoid a foreclosure—provided an intangible value to the debtor and its creditors that established

value for purposes of Section 548(a)(1)(B). *See id.* ("The court cannot accept the Trustee's purely

'cash' value analysis, because to do so would potentially invalidate virtually every loan

transaction; there are always fees associated with the loan and the borrower never gets in cash the

full amount it borrows."). Here, the CPIF Loan provided significant new money that was needed

to complete construction on the Crescent Parc and Frisco Wade projects while also enabling the

Borrowers to refinance out of a deteriorating relationship with its previous lender. *See* Compl. ¶¶

27, 28. Moreover, the Borrowers were represented by counsel who the Complaint makes clear was

willing to push back and negotiate with CPIF, contradicting any assertion that the CPIF Loan was

not an arms' length transaction. Compl. ¶ 37. *Accord Off. Comm. of Unsecured Creditors v.*

*Goldman Sachs Credit Partners L.P. (In re Redders N. Amer., Inc.)*, 405 B.R. 527, 547 (Bankr. D.

Del. 2009) (finding that a loan where there was little evidence that the lenders did not act in good

faith and participated in an arms' length negotiation was supported by reasonably equivalent

value).  Here, the Complaint has no well-pleaded facts that suggest CPIF's terms were above-

market or were not the result of an arms' length transaction. Instead, the Complaint makes the

blanket allegation that the fees were "above market" and that the Debtors "did not even try to

negotiate better terms" despite the Complaint later alleging that there was ongoing negotiations

about the use of loan proceeds and the legal opinion to be delivered at closing. Compl. ¶¶ 30, 37,

53. The idea that CPIF, a third-party lender with no connection to the Debtors or their officers,

was able to somehow take advantage of the Borrowers is simply not plausible given the facts in the Complaint.[11]

50.    To the extent the Trustee seeks to avoid payments made with proceeds of CPIF loans, as noted above, *supra* Part IV.A, the proper defendants are the recipients of those transfers, not CPIF. Moreover, the Trustee must identify what payments he is seeking to avoid and how they connect with any loan disbursements. Given that the Complaint fails to do that, Counts 2, 4, and 5 fail and must be dismissed.

### 2.    The Complaint Lacks any Well-Pleaded Fact Regarding Insolvency

51.    Insolvency must be pleaded with reference to financial data, otherwise it is merely conclusory. *Tow v. Bulmahn*, 565 B.R. 361, 366 (E.D. La. 2017) ("The Trustee's allegation that '[the debtor's] debts remained greater than its assets at fair valuation' from May 2010 forward is a mere conclusion."). *See also In re ATP Oil & Gas Corp.*, 711 F. App'x 216, 223 (5th Cir. 2017) ("Plaintiff cannot plausibly show that ATP was insolvent at the time of the transfers" when "Plaintiff failed to present any financial data showing that ATP was actually insolvent or had little capital when making the [transfers]").

52.    Here, the Complaint lacks any reference to the Borrowers' financial position. Despite the Trustee having access to the Debtors' books and records, the Complaint alleges only that the CPIF Loan "left the Debtors" (not the Borrowers, specifically) "in a worse financial condition than before the transaction" (Compl. ¶ 41) along with other conclusory statements that the Borrowers were insolvent (Compl. ¶¶ 44, 70, 85, 90). These recitations of the elements of

---

[11] To a certain extent, the Trustee's argument is circular: either there was a pressing need for the Borrowers to refinance their existing lender, in which case the fees paid to CPIF are supported by alleviating that pressing need to refinance or there was no significant need to refinance the existing lender, in which case there is no plausible explanation for why the Borrowers would have agreed to above-market terms.

constructive fraud are not sufficient to meet the pleading standard, and Counts 2, 4, and 5 should be dismissed.

### C.      A Creditor Cannot Receive a Preference by Applying Its Own Collateral to Its Debt

53.      Count 9 seeks to avoid three payments that CPIF effected by applying funds it held in reserve under the loan documents. *See* Compl. ¶ 108. However, those funds were part of CPIF's collateral package and therefore any application of those funds to the debt held by CPIF cannot be preferential. *See Krafsur*, 171 F.3d at 254.

54.      As explained by the Fifth Circuit, this outcome is a necessary result of how application of collateral affects the recoveries in a hypothetical chapter 7 case. *Id.* (referencing 11 U.S.C. § 547(b)(5)'s requirement that a preferential payment must enable a creditor to receive more than it would have in a hypothetical chapter 7). So long as the collateral is used to reduce the secured debt of the creditor, the net effect on the debtor's estate is nil, as the secured creditor would have been entitled to its collateral in a chapter 7 case. *Id.* ("A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.").

55.      Here, CPIF took funds that were its collateral[12] and applied them to the Borrowers' outstanding debt. As a matter of law, such application of collateral proceeds cannot be preferential and there is not plausible path to recovery under Count 9. It should be dismissed.

---

[12] In accordance with Sections 19.14, and 20.15 of the Loan Agreement, all reserves held by CPIF were collateral (properly perfected by CPIF's control) and CPIF was granted the express right to make payments by applying funds held in reserve.  *See Construction Loan*, attached as Exhibit 1 to *Limited Objection of CPIF Lending, LLC to Chapter 11 Trustee's Motion to Sell Certain Commercial Property in Frisco, Texas Free and Clear of Liens, Claims, and Encumbrances Under 11 U.S.C. § 363* [Main Case Docket No. 315].

**D.    Count 6 Fails Because CPIF is not an Insider**

56.    Count 6 is based on Tex. Bus. & Com. § 24.0006(b), which applies specifically to transfers made "to an insider" at a time when the debtor-transferor was insolvent.  In the context of the Texas Uniform Fraudulent Transfer Act, the Fifth Circuit has identified two factors in determining whether a party is an insider: "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."  *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

57.    Here, the Complaint does not make any allegations about CPIF's role as an insider nor does it suggest that there was any kind of close relationship between CPIF and the Borrowers that would suggest that CPIF was an insider. And as noted above, the Complaint lacks any factual allegation suggesting that the Borrowers were insolvent. Therefore, Count 6 should be dismissed.

58.    To the extent Count 6 is attempting to avoid transfers to insiders made with proceeds of the CPIF Loan, the appropriate defendants are the insider recipients of those transfers. *See supra* Part IV.A. Absent specific pleadings by the Trustee setting forth a theory of liability that would make CPIF liable for transfers where it was not the transferee, Count 6 should be dismissed with regard to such third-party transfers.

**E.    Texas Does Not Currently Recognize a Cause of Action for Aiding and Abetting a Breach of Fiduciary Duty.**

59.    Count 7 of the Complaint alleges that CPIF is liable for aiding and abetting breaches of fiduciary duty by various Borrower officers and directors. Compl. ¶¶ 95-96. However, Texas law does not recognize such a cause of action and, in accordance with Fifth Circuit precedent, federal courts have dismissed claims asserting claims for aiding and abetting a breach of fiduciary duty. *Taylor v. Rothstein Kass & Co., PLLC*, 2020 WL 554583, at *5 (N.D. Tex. July 1, 2019)

("But the Fifth Circuit has held that 'no such claim [for aiding and abetting] exists in Texas' and has refused to recognize such a claim because 'a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by state courts.'") (brackets in original) (quoting *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 782, 781 (5th Cir. 2018)). Count 7 should therefore be dismissed.

**F.    The Complaint Fails to Plead a Colorable Claim of Civil Conspiracy.**

60.    The elements of a claim for civil conspiracy are: "(1) two or more persons, (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). In order to properly allege a conspiracy claim, a complaint must first properly allege an underlying tort. *See Floyd v. Hefner*, 556 F.Supp. 2d 617, 656 (S.D. Tex. 2008) ("Under Texas law, civil conspiracy is a derivative tort. If a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails.").

61.    The civil conspiracy claim under Count 8 here fails for two reasons: (1) it fails to establish any meeting of the minds between CPIF and a person owing a fiduciary duty to the Debtors and (2) it fails to properly identify an underlying breach of fiduciary duty.

62.    Although courts will permit circumstantial evidence in order to establish conspiracy, a complaint must still allege some actual agreement to establish a claim for civil conspiracy. *See Tow v. Bulmahn*, 2016 WL 1722246 at * (E.D. La. Apr. 29, 2016) ("The Second Amended Complaint's sole conspiracy allegation is that defendants 'conspired, aided and abetted, and acted in concert with one another in breaching the fiduciary duties owed by Defendants' and in 'allowing the distribution of...fraudulent transfers.'") (*aff'd Matter of ATP Oil & Gas Corp.*, 711 Fed. Appx. at 224). Here, there is no allegation that CPIF made any agreement or had any meeting of the minds with any fiduciary of the Debtors. In fact, the Complaint fails to even identify

the specific persons with whom CPIF allegedly conspired with; it instead lumps all potential fiduciaries of the Debtors into the relevant allegations. Compl. ¶¶ 102-04. Combined with the fact that the bulk of the Complaint documents situations where CPIF refused to comply with requests from the Debtors and their fiduciaries (*see* Compl. ¶¶ 37, 52, 53, 56, 57, 58, 62), there is simply no plausible theory for how such a conspiracy would work.

63.     Likewise, the Complaint fails to identify exactly how the CPIF Loan represented a breach of the fiduciary duties officers and directors owed to MES or FWC. *See* Compl. ¶ 104 (describing how various parties owed fiduciary duties to MES and FWC). While it seems likely that Carter, through the fraud perpetrated through non-Borrower entities, likely breached various fiduciary duties to those non-Borrower entities or the purported investors, the Complaint does not make any allegations regarding specific breaches of duties owed to MES or FWC. Absent that breach of fiduciary duty, there can be no civil conspiracy claim against CPIF. Therefore, Count 8 should be dismissed.

**G.     The Complaint Does Not State a Valid Basis for Equitable Subordination, as CPIF was not a Fiduciary and Did Not Have Undue Influence over the Borrowers**

64.     The Fifth Circuit has "largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *Matter of U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994). The third paradigm is typically found when a defendant "ma[kes] any misrepresentations to third parties, such as creditors or suppliers, that additional financing was in place or that [the debtor] was solvent when the opposite was true." *See Holt v. Fed. Depist Ins. Corp. (In re CTS Truss, Inc.)*, 868 F.2d 146, 149 (5th Cir. 1989) (also discussing whether the targeted creditor manipulated its collateral package to the detriment of other creditors).

22

65.     As noted above, CPIF did not have any close relationship with the Borrowers, and it did not owe any fiduciary duty to the Borrowers. The Complaint clearly shows that CPIF did not control the Borrowers, as the parties were often in disagreement about how loan and collateral proceeds should be used.

66.     The Complaint also lacks any factual allegations suggesting that CPIF "actually defrauded" other creditors: there are no allegations that CPIF even interacted with other creditors beyond funding payments in accordance with the loan documents. Likewise, there are no allegations that CPIF attempted to manipulate its collateral package.[13] Because the Trustee has not alleged that CPIF falls into any one of the paradigms necessary for the extraordinary remedy equitable subordination, equitable subordination does not apply to CPIF's claim and that claim for relief should be dismissed.

## RESERVATION OF RIGHTS

67.     The Complaint ends with a far-reaching objection to CPIF's claim. The bulk of the objection appears to tie into the various Counts discussed above. To the extent tied to specific causes of action previously discussed, the claim objection aspect of the Complaint fails for the same reasons set forth above.

68.     To the extent the Trustee seeks to disallow CPIF's claim on another basis, the Complaint as currently written lacks the specificity required to put CPIF on notice of the specific objections that the Trustee has (and whether such objections exist independent of the Complaint's separate Counts).

69.     Moreover, the Trustee cannot assert a right to surcharge CPIF's collateral pursuant to section 506(c) while at the same time seeking, *inter alia*, to disallow CPIF's secured claim (put

---

[13] Indeed, the Trustee, in his motion to substantively consolidate the Debtors, asserted that CPIF was well over-secured based on its original collateral package.

another way, how did the Trustee take action to preserve CPIF's collateral if the Trustee believes

CPIF to be unsecured.  In addition, any surcharge efforts must identify specific actions taken by

the Trustee and how those efforts, and their related costs, specifically benefited CPIF.  As such,

these miscellaneous aspects of the Complaint are patently flawed and must be dismissed on

account thereof.

70.     Given the lack of clarity on these points in the Complaint, CPIF reserves all its

rights with regard to the claim objection.

WHEREFORE, the Court should dismiss the Complaint with prejudice and grant such

other relief as is just and necessary.

Dated: June 4, 2020                  Respectfully submitted,

*/s/ Thomas C. Scannell*
Marcus A. Helt (TX 24052187)
Thomas C. Scannell (TX 24070559)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone:  214.999.3000
Facsimile:  214.999.4667
mhelt@foley.com
tscannell@foley.com

-and-

Michael J. Barrie (admitted *pro hac vice*)
**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Telephone: 302.442.7010
Facsimile: 302.442.7012
mbarrie@beneschlaw.com

-and-

Sven T. Nylen (IL #6278148; admitted E.D. Tex.)
Jacob H. Marshall (admitted *pro hac vice*)
71 South Wacker Drive, Suite 1600

Chicago, IL 60606
Telephone: 312.212.4949
Facsimile: 312.767.9192
snylen@beneschlaw.com
jmarshall@beneschlaw.com

*Counsel to CPIF Lending, LLC*


<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing motion was served on all parties to this proceeding on June 4, 2020, via electronic service through the Court's CM/ECF system.

*/s/ Thomas C. Scannell*
Thomas C. Scannell