## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## (SHERMAN DIVISION)

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-40426** |
| **CFO MANAGEMENT** | § | |
| **HOLDINGS LLC,**[1] | § | |
| | § | **CHAPTER 11** |
| **Debtor.** | § | |
| | § | |
| | § | |
| **DAVID WALLACE, CHAPTER 11** | § | |
| **TRUSTEE FOR THE BANKRUPTCY** | § | |
| **ESTATE OF CFO MANAGEMENT** | § | |
| **HOLDINGS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **ADVERSARY NO. 20-04054** |
| | § | |
| **CPIF Lending, LLC, a Washington** | § | |
| **Limited Liability Company** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## TRUSTEE'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS COMPLAINT

[1] The following entities' bankruptcy cases and estates have been substantively consolidated with that of Debtor CFO Management Holdings, LLC (EIN# XX-XXX6987) for all purposes (see Docket No. 248): Carter Family Office, LLC (Case No. 19-40432); Christian Custom Homes, LLC (Case No. 19-40431); Double Droptine Ranch, LLC (Case No 19-40429); Frisco Wade Crossing Development Partners, LLC (Case No. 19-40427); Kingswood Development Partners, LLC (Case No. 19-40434); McKinney Executive Suites at Crescent Parc Development Partners, LLC (Case No. 19-40428); North-Forty Development LLC (Case No. 19-40430); and West Main Station Development, LLC (Case No. 19-40433). The following mailing address can be used for the consolidated Debtor with respect to these cases: c/o David Wallace, Chapter 11 Trustee, 4131 North Central Expressway, Suite 775, Dallas, Texas 75204.

# TABLE OF CONTENTS

I.   INTRODUCTION AND OVERVIEW ..................................................................................... 1

II.   RULE 12 STANDARD ............................................................................................................ 2

III.   RESPONSES TO GENERAL ALLEGATIONS ............................................................ 4

    A.   RELEVANCE OF GUESS AND CARTER ALLEGATIONS IN COMPLAINT ................................... 5

    B.   CPIF'S KNOWLEDGE OF CARTER'S ACTIVITIES .................................................................. 6

    C.   CPIF'S MANUFACTURED RELIANCE ON DEBTORS' COUNSEL'S OPINION LETTER ............... 7

    D.   THE "COHERENT THEORY" OF CPIF'S INVOLVEMENT IN THE SCHEME ............................... 8

    E.   THE COMPLAINT'S FACTUAL ALLEGATIONS REGARDING INSOLVENCY ............................. 9

IV.   RESPONSES TO SPECIFIC ALLEGATIONS .......................................................... 11

    A.   CAUSES OF ACTION 1 AND 3: ACTUAL FRAUDULENT TRANSFER ...................................... 11

    B.   CAUSES OF ACTION 2, 4, AND 5: CONSTRUCTIVE FRAUDULENT TRANSFER ...................... 19

    C.   CAUSE OF ACTION 9: PREFERENCES .................................................................................23

    D.   CAUSE OF ACTION 6: INSIDER FRAUDULENT TRANSFER UNDER § 24.006(B) ..................25

    E.   CAUSE OF ACTION 7: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ...................25

    F.   CAUSE OF ACTION 8: CIVIL CONSPIRACY TO COMMIT FRAUDULENT TRANSFER............................ 26

    G.   EQUITABLE SUBORDINATION .......................................................................................... 26

# Table of Authorities

## Cases

*Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154 (Bankr. D.N.M. 1981) ...... 18

*Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) ........................ 17, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................. 3, 4, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................... 2, 3, 23

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977) .................. 27

*Chastant v. Chastant (In re Chastant)*, 873 F.2d 89 (5th Cir. 1989) ............................ 16

*Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157 (5th Cir. 1982) ..................... 4

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000) ............................ 2

*D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197 (5th Cir. 2018) .................................. 25

*First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339 (9th Cir. 1986) ....................... 18

*First Nat'l Bank v. Hooper*, 104 S.W.3d 83 (Tex. 2003) ............................................. 20

*Flushing Sav. Bank v. Parr*, 81 A.D. 2d 655 (N.Y. 2d 1981) ....................................... 13

*Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.)*, 323 B.R. 838,
    (Bankr. S.D.N.Y. 2005) .......................................................................... 20

*In re American Properties, Inc.*, 14 B.R. 637 (Bankr. Kan. 1981) ................................ 13

*In re Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991) ............................................. 27

*In re Hinsley*, 201 F.3d 638 (5th Cir. 2000) ....................................................... 21

*In re Katrina Canal Breaches Litig.*, 493 F.3d 191 (5th Cir. 2007) ................................. 7

*In re Missionary Baptist Found., Inc.*, 712 F.2d 206, 212 (5th Cir. 1983) ......................... 28

*In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557 (Bankr. N.D. Cal. 1994) ................. 14

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, (5th Cir. 1982) ... 2

*Local Loan Co. v. Hunt*, 292 U.S. 234 (1934) ....................................................... 27

*Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010) ............... 3

*Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634 (5th Cir. 2007) ................................. 25

*Neitzke v. Williams*, 490 U.S. 319 (1989) ........................................................... 2

*Off. Comm. Of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re
    Redders N. Amer., Inc.)*, 405 B.R. 527 (Bankr. D. Del. 2009) ................................ 21

*Pepper v. Litton*, 308 U.S. 295 (1939) .............................................................. 27

*Retz v. Samson (In re Retz)*, 606 F.3d 1189 (9th Cir. 2010) ..................................... 15

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ............................................................ 2

*Shapiro v. Wilgus*, 287 U.S. 348 (1934) ......................................................... 13, 14

*Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562 (7th Cir. 1989) ......... 15

*Soza v. Hill (In re Soza)*, 542 F.3d 1060 (5th Cir. 2008) ......................................... 16

*Stanley v. US Bank Nat'l Ass'n (In re TransTexas Gas Corp.)*, 597 F.3d 298 (5th
    Cir. 2010) ..................................................................................... 21

*Tri v. J.T.T.*, 162 S.W. 3d 552 (Tex. 2005) ...................................................... 26

*Walch v. Adjutant General's Dep't of Tex.*, 533 F.3d 289 (5th Cir. 2008) ........................ 7

*Whitaker v. City of Houston*, 963 F.2d 831 (5th Cir. 1992) ....................................... 4

*Whitaker v. Mortgage Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62
    (Bankr. W.D.N.C. 2002) ..................................................................... 20, 21

*Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655 (5th Cir. 2017) ............................... 15, 18

*Wimm v. Jack Eckerd Corp.*, 3 F.3d 137 (5th Cir. 1993) .......................................... 4

**Statutes**

11 U.S.C. § 510..........................................................................................................27
11 U.S.C. § 547..........................................................................................................23
11 U.S.C. § 548...........................................................................................16, 19, 23
11 U.S.C. § 550................................................................................................19, 23
11 U.S.C. § 551..........................................................................................................19
Texas Business and Commerce Code § 24.006(b)..........................................25

**Rules**

Fed. R. Civ. P. 8 .......................................................................................................3
Fed. R. Civ. P. 12 ....................................................................1, 2, 3, 7, 11, 20, 22
Fed. R. Civ. P. 15 ....................................................................................................4

**Treatises**

5 Collier on Bankruptcy ¶ 548.04[1]................................................................13
5 Collier on Bankruptcy ¶ 548.05[3][a]............................................................9

David Wallace (the "**Trustee**"), as Chapter 11 Trustee for the bankruptcy estate of CFO Management Holdings, LLC (the "**Debtor**"[2] and with its now-consolidated Subsidiary Debtors, the "**Debtors**"), files this Response in Opposition to Defendant CPIF Lending's Motion to Dismiss Complaint and Objection to Claim (Adv. Docket No. 15) (the "**Motion**"), filed by CPIF Lending, LLC ("**CPIF**" or "**Defendant**"), and would respectfully show the Court as follows:

## I.    INTRODUCTION AND OVERVIEW

1.    In the face of a 34-page, 122-paragraph Complaint—including 14 pages and 48 paragraphs of detailed factual allegations—the Defendant seeks dismissal of the Complaint in its entirety for allegedly failing to state a single claim upon which relief may be granted. The Motion suffers most from an apparent misunderstanding of the rules of pleading in federal courts. The Defendant dedicates the bulk of its Motion to arguing the substantive merits of the claims the Trustee asserts against CPIF in the Complaint. That the Defendant understands the nature of the claims asserted in the Complaint well enough to marshal arguments in its defense shows that the Complaint satisfies Rule 8's "notice pleading" standards as interpreted by applicable Supreme Court and Fifth Circuit precedents.

2.    The Motion devotes just two short paragraphs articulating the legal standards that apply to Rule 12(b)(6) motions to dismiss and spends the remainder of the Motion ignoring them. Rather than analyze the Complaint against the liberal pleading standards

---

[2] Capitalized terms not defined herein have the meaning provided in the Trustee's original Complaint in this adversary proceeding.

that require courts to overrule motions brought under Rule 12(b)(6) in all but the rarest circumstances, the Motion repeatedly accuses the Trustee of lacking "evidence" or pleading with insufficient "specificity" or being too "conclusory" in the Complaint. In doing so, the Defendant fails to apply the correct pleading standard. The level of detail Defendant demands goes beyond what is required of pleadings under the Federal Rules applicable to bankruptcy adversary proceedings. Because the Defendant applies the wrong standard to the Complaint throughout, the Motion should be denied.

## II.   RULE 12 STANDARD

3.      "A motion to dismiss under Rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." When considering a Rule 12(b)(6) motion to dismiss, a court must generally accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). While "[f]actual allegations must be enough to raise a right to relief above the speculative level," the Supreme Court of the United States explained that a complaint "does not need detailed factual allegations . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations")); *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236, (1974) (a well-pleaded complaint may proceed even if it appears

"that a recovery is very remote and unlikely")).

4.      Following up on its analysis in *Twombly*, the Supreme Court elaborated on

what is necessary to survive a motion to dismiss:

> To survive a motion to dismiss, a complaint must contain
> sufficient factual matter, accepted as true, to "state a claim to
> relief that is plausible on its face." A claim has facial
> plausibility when the plaintiff pleads factual content that
> allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged. The
> plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that
> a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). In other words, as

explained by the Fifth Circuit, "[t]he court's task is to determine whether the plaintiff has

stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood

of success. " *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir.

2010) (citing *Iqbal*).

5.      Before *Twombly* and its progeny, courts applied an even more liberal "fair

notice" standard—namely, a complaint need only contain "a short and plain statement

. . . showing that the pleader [was] entitled to relief, in order to give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S.

544, 548 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). This "notice"

requirement is still present in the Federal Rules. *See* Fed. R. Civ. P. 8(a)(2) ("A pleading

that states a claim for relief must contain . . . a short and plain statement of the claim

showing that the pleader is entitled to relief[.]"); *see also Iqbal* , 556 U.S. at 678 ("the

pleading standard Rule 8 announces **does not require 'detailed factual allegations,'** but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation . . . .") (emphasis added).

6.      In the Complaint, the Trustee has more-than-sufficiently demonstrated legally cognizable claims that satisfy the plausibility standard. If, however, the Court finds that any cause of action asserted in the Complaint fails to state a claim, the Trustee should be afforded an opportunity to amend the Complaint in lieu of outright dismissal, and the Trustee hereby requests such leave.[3]

## III.   RESPONSES TO GENERAL ALLEGATIONS

7.      Paragraphs 21-33 of CPIF's Motion allege five general deficiencies with the Complaint: (A) that the Complaint's descriptions of activities by Bob Guess and Philip Carter are irrelevant to the causes of action asserted against CPIF (Mot. ¶¶ 21-23); (B) that "[n]othing in the Complaint suggests that CPIF knew the extent of Carter's involvement in the TFF scheme" (Mot. ¶ 24); (C) that CPIF reasonably relied on Debtors' counsel, which absolves CPIF of liability (Mot. ¶¶ 24-25); (D) that the Complaint "does not present a coherent theory on why CPIF would involve itself the Carter scheme" (sic) and fails "to link CPIF to the fraudulent scheme or even explain how CPIF was beneficial to Carter and Guess's scheme." (Mot. ¶¶ 27-28); and (E) that the Complaint contains "zero factual

---

[3] In this Circuit, when a complaint is dismissed, but the action is not terminated altogether, the plaintiff may amend under Rule 15(a) with permission of the court, especially when the case is in its early stages. *See Whitaker v. City of Houston*, 963 F.2d 831, 835 (5th Cir. 1992); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) (quoting Fed. R. Civ. P. 15(a)); *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1162 (5th Cir. 1982) (explaining Rule 15(a) requires trial court to grant leave to amend freely, language of rule "evinces a bias in favor of granting leave to amend").

allegations regarding the insolvency or financial condition of the Borrowers . . . ."
(Mot. ¶ 31). Each of these general allegations is wrong.

### A. Relevance of Guess and Carter Allegations in Complaint

8.      It is true that 13 of the 122 paragraphs in the Complaint describe the "massive
years-long multi-million-dollar consumer-fraud scheme" perpetrated by Philip Carter
when he was President of the Subsidiary Debtors. (Compl. ¶¶ 15-27). Contrary to the
Defendant's assertion, this does not constitute "[t]he bulk of the Complaint." (Mot. ¶ 21).

9.      The background facts concerning Bob Guess and Philip Carter are included to
provide necessary context for the specific factual allegations made in the Complaint that
the Defendant was (or should have been) aware of various "red flags" that put CPIF—at
the very least—on inquiry notice that it should proceed with extreme caution before
conducting business with any Carter-controlled entities. These background facts are
relevant to the Trustee's claims the CPIF Transfer was effected at a time when CPIF either
knew of the many problems that plagued the Carter-controlled companies or was willfully
blind to them. For example, paragraphs 23-25 of the Complaint describe legal disputes
that the Borrowers had been embroiled in with one of their contract counter-parties. The
lawsuit brought by Crossland Construction was public knowledge, and the claims
asserted (breach of contract and foreclosure of M&M liens) should have put CPIF on
notice that the Borrowers had not been paying their debts as they came due). Paragraphs
22 and 26 of the Complaint refer to another suit involving Carter-controlled companies,
the state interpleader action, in which—again—it was clear to anyone inquiring into the

nature of the suit that Carter-controlled entities were having trouble making timely payments to their creditors (in this instance, investors).

10.      These specific background facts are provided as predicate to the allegation that "CPIF and its agents, Shields and Nelson, knew or should have known about the state and federal investigations into Carter and the litigation that Subsidiary Debtor entities had been embroiled in with the government, prior lenders, their previous construction contract partners, and cheated investors." (Compl. ¶ 29).

### B. CPIF's Knowledge of Carter's Activities

11.      Contrary to the Motion's assertion that "[n]othing in the Complaint suggests that CPIF knew the extent of Carter's involvement in the TFF scheme" (Mot. ¶ 24), paragraphs 29-33 of the Complaint allege with abundant specificity—quoting emails between CPIF and Debtor representatives—that CPIF was aware of much of what Carter-controlled entities were doing. Instead of taking time to conduct thorough due diligence and get to the bottom of things, CPIF instead rushed to close the transaction before Carter was indicted.

12.      Paragraphs 34 and 35 of the Complaint contain factual allegations that Kelly Carney, a representative of the Debtors, asked for CPIF's assistance in perpetuating Carter's shell game in which investors would be paid just enough to keep the scheme going, but only after CPIF had lined its own pockets. The allegations in the Complaint are clear and specific. If the Court accepts them as true (as required when deciding a Rule 12(b)(6) motion to dismiss), the facts alleged support a finding that CPIF knew the Debtors were seeking a loan with the intent to hinder or delay creditors. In other words,

the Debtors wanted to commit an actual fraudulent transfer, and they were soliciting CPIF's assistance to carry it out.

13.    Paragraph 36 of the Complaint alleges that CPIF was only too happy to oblige the request, even after being told that some investors in Carter's companies had lost their "life savings" and that the Debtors only want to pay such individuals if doing so was "business sound."

14.    These paragraphs of the Complaint are more than sufficient to state a claim for which relief can be granted. The facts alleged in paragraphs 29-36 support causes of action 1, 3, 7, and 8. CPIF may believe it has defenses to such claims, but that is not the question at the motion-to-dismiss stage of the proceedings. The only question at this stage is whether the factual allegations raise the Trustee's right to relief beyond the speculative level. They do.

### C.  *CPIF's Manufactured Reliance on Debtors' Counsel's Opinion Letter*

15.    CPIF argues that its willful blindness to Carter's activities is excused because it obtained an opinion letter from Debtors' outside legal counsel (Mot. ¶¶ 24-25).[4] But the import of the opinion letter is addressed in paragraphs 37-40 of the Complaint, which details how CPIF continually pushed for a quick closing and demanded that the opinion

---

[4] CPIF attached the final opinion letter as an exhibit to the Motion. As a procedural matter, the opinion letter is not a document of which the Court may take judicial notice. Accordingly, the Defendants' allegations regarding the content of the opinion letter should be excluded and not considered by the Court as part of the Rule 12 analysis. *In re Katrina Canal Breaches Litig.*, 493 F.3d 191, 206 (5th Cir. 2007) (quoting Rule 12(b)(6)) ("Generally, in deciding a motion to dismiss for failure to state a claim, if matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment"). However, the plain language of Rule 12(b)(6) makes such conversion optional, and even where exclusion is appropriate, Fifth Circuit courts have elected to exclude documents without argument instead of converting the motion to one for summary judgment. *See Walch v. Adjutant General's Dep't of Tex.*, 533 F.3d 289, 293– 94 (5th Cir. 2008) (electing to consider only those letters attached to defendant's motion to dismiss which were "explicitly referenced" in the complaint).

letter contain representations that the Borrowers' outside counsel was not comfortable making. These facts raise the reasonable inference that CPIF had ulterior motives for securing an opinion letter, and that CPIF was more concerned with obtaining representations it could use as a defense to future litigation than uncovering the truth about the full range of activities Carter-controlled companies had been engaged in. At the very least, the allegations in the Complaint regarding CPIF's level of interference in the representations that would go into the opinion letter raise questions that can be answered with further discovery.

### D. The "Coherent Theory" of CPIF's Involvement in the Scheme

16.    The Motion repeatedly accuses the Trustee of having no "coherent theory" as to "why CPIF would involve itself" in Carter's scheme or "how CPIF was beneficial" to the same. (Mot. ¶¶ 20, 27-28, 30, 32, 49 n.11). But the theory is clearly laid out in the Complaint: CPIF saw an opportunity to earn exorbitant fees with minimal effort and little risk by lending money to distressed debtors who would agree to draconian loan terms while providing a first-priority lien on valuable real estate. The Debtors saw an opportunity to buy time to keep the scheme moving, and CPIF saw a way to line its pockets helping the Debtors accomplish that objective, all to the detriment of the bilked investors whose unsecured claims would now be in line for payment behind a fully secured CPIF. That's the theory, and it's supported by a plethora of specifically pleaded facts in paragraphs 28 through 62 of the Complaint.[5]

---

[5] CPIF asserts that its claim against the estate has grown to approximately $30 million as of early March 2020 (see ¶ 11 in Docket No. 448 in Main Case No. 19-40426), despite the fact that CPIF purportedly only paid out between $25–26 million to or on behalf of the Debtors. This amount does not include interest that CPIF paid itself from loan reserves but does include approximately $2 million in higher-than-market-rate

17.    For example, paragraphs 52-58 detail how CPIF took possession of 100% of proceeds from a property sale, refused to release those funds to pay any Debtor obligations, then discussed releasing some of the proceeds to the Debtors (but not to pay investors, thereby hindering and delaying them from being paid), and then—instead of using the sale proceeds to pay down the Debtors' obligation under the CPIF Loan—held the money on reserve for three months to rack up $660,000 in default interest (at a usurious rate).[6]

### E.  The Complaint's Factual Allegations Regarding Insolvency

18.    As noted by Collier , "insolvency at a later time may be indicative of insolvency at an earlier time . . . ." 5 Collier on Bankruptcy ¶ 548.05[3][a]. The Debtors' bankruptcy filing just a few months after the CPIF Transfer occurred thus supports the inference that the Debtors were insolvent at the time of the CPIF Transfer.

19.    The Motion incorrectly asserts that "[t]here are zero factual allegations regarding the insolvency or financial condition of the Borrowers" when the CPIF Transfer occurred. (Mot. ¶ 31). To the contrary, paragraphs 43-45 and 47 of the Complaint assert that FEC and MWS were insolvent, that CPIF knew or should have known they were insolvent, and that CPIF did not seek or obtain a solvency opinion before entering into the transaction. Implicit in this allegation is that CPIF did not bother to seek a solvency

---

broker and origination fees. As referenced below, CPIF also received and subsequently applied to this amount approximately $3 million in proceeds from the sale of portions of the Frisco Wade Crossing development. The rapid growth in CPIF's asserted claim is due to CPIF applying an 18% default interest starting in mid-November 2018, mere weeks after the September 28 closing on the CPIF Loan. The "default" CPIF relied on at the time was the investigation of Phillip Carter, of which CPIF was aware prior to closing on the loan, and the resulting indictment of Phillip Carter.

[6] The Trustee's "coherent theory" of what CPIF did wrong is also summarized in bullet-point fashion in paragraph 119 of the Complaint addressing CPIF's inequitable conduct justifying subordination of its claim.

opinion because everyone involved knew the Borrowers were insolvent. The exorbitant fees charged for the loan are further inferential evidence that CPIF knew they were dealing with insolvent entities. In addition, the Complaint is replete with other factual allegations that provide substantial plausible support for the allegation that the Debtor was insolvent at the time of the CPIF Transfer, including the following:

- Paragraph 15 of the Complaint refers to a "multi-million-dollar consumer fraud scheme."

- Paragraphs 16, 19, and 26 of the Complaint all refer to "Ponzi payments to investors."

- Paragraph 22 of the Complaint discusses the interpleader action, of which CPIF should have been aware, that was evidence of Carter-controlled entities not paying debts as they came due.

- Paragraph 24 of the Complaint discusses the lawsuit filed by the Borrowers' former construction contractor for breach of contract and foreclosure on liens, again indicating that the Debtors—and specifically the Borrowers MES and FWC—were not paying their debts as they came due.

- Paragraph 29 of the Complaint summarizes what CPIF knew or should have known concerning the Borrowers' ongoing troubles with "government, prior lenders, their previous construction contract partners, and cheated investors."

- Paragraph 33 of the Complaint quoting what James Frinzi told CPIF about Bob Guess's actions and how the Carter-controlled companies conducted business provides a reasonable inference that those companies were insolvent.

- Paragraph 34 of the Complaint quotes an email from Kelly Carney to CPIF in which he admits that the Borrowers "just try and give people their money back as best and expeditious as we can," which is just another way of saying the Borrowers were not in the habit of paying their debts as they came due.

- Paragraph 35 of the Complaint quotes an email from Kelly Carney to CPIF in which he posits that "in theory you [sic] 32M could be paid back in Jan, and sales could fund the remainder of the projects and it still leaves a

surplus **to address the investor payout over the life of the projects**,"
clearly indicating that the Borrowers were not current on their obligations
to the investors and were seeking to further delay payment to them even
after their expected $32 million cash infusion from CPIF.

- Paragraph 36 of the Complaint quotes another email from Kelly Carney to
CPIF, in which he says: "Having heard their stories of lost life savings,
health problems, if no surgery they are going to die, etc......**you want to
pay them back as soon as can or as many as can** but it has to be
business sound." Again, this indicates that the Borrowers were not paying
their debts as they came due.

20.    Given all of the foregoing, it is astonishing that CPIF would claim that the
Complaint has "zero allegations" regarding the Borrowers' financial condition. If more
than what is in the Complaint on insolvency is required to survive a Rule 12(b)6 motion,
it is hard to envision many Chapter 5 complaints surviving such a strict review.

IV.   **RESPONSES TO SPECIFIC ALLEGATIONS**

   A. *Causes of Action 1 and 3: Actual Fraudulent Transfer*

21.    In paragraphs 34-44 of the Motion, CPIF argues that the Complaint fails to
allege any participation by CPIF in Carter's fraudulent scheme. This is, of course,
irrelevant to causes of action 1 and 3 (though CPIF's participation is relevant to causes of
action 7 and 8). For an actual fraudulent transfer, it is the Debtors' intent to hinder or
delay or defraud that is relevant.

22.    Nevertheless, as described in Section III above, the Complaint is brimming
with specific factual allegations concerning CPIF's knowledge, willful blindness, and
active participation in supporting the activities of Philip Carter and the entities he owned
and controlled to the detriment of existing investor creditors.

23.     Concerning causes of action 1 and 3, CPIF wrongly asserts that "the Complaint makes no allegations that FWC or MES were subject to any lawsuit before or after the CPIF Loan closed." (Mot. ¶ 38). Paragraph 24 of the Complaint does just that (". . . on March 2, 2017 Crossland filed suit against MES and FWC in Collin County District Court for breach of contract and foreclosure of a mechanic's and materialmen's lien.").

24.     Likewise, in paragraph 39 of the Motion, CPIF asserts that "[t]here are no allegations that CPIF was aware of the extent of Carter's involvement in the fraud or that CPIF provided any direct support to the fraud." But as shown above, the Complaint contains numerous allegations that CPIF knew or should have known about Carter's activities, his companies' inability (or refusal) to pay their debts, and the sketchy nature of their business model.

25.     CPIF also appears to be under the misapprehension that the Trustee must prove—with "evidence" in the Complaint no less—all the elements of "fraud" on the part of CPIF in order to maintain an action for actual fraudulent transfer under Bankruptcy Code § 548. Not so. The Trustee need only allege facts sufficient to show that the transfer the Trustee seeks to avoid (in this case, the CPIF Transfer, as defined in paragraph 42 of the Complaint) had the intended effect of hindering *or* delaying *or* defrauding creditors of the Borrowers. The elements for an actual fraudulent transfer are disjunctive not conjunctive. And the Complaint makes it crystal clear that the Debtors intended (and CPIF knew) that completing the CPIF Transfer would hinder, delay, or defraud at least some of the Borrowers' creditors.

26.     Hindrance, delay, and fraud are "distinct elements, any one of which is sufficient to render the transfer fraudulent." 5 Collier on Bankruptcy ¶ 548.04[1] at 548-23; *Flushing Sav. Bank v. Parr*, 81 A.D. 2d 655, 656 (N.Y. 2d 1981) (noting that "by the use of the disjunctive, 'hinder' and 'delay' exist independently of an intent to defraud"). CPIF is liable if the Debtors intended the CPIF Transfer to result in a delay of payment for one or more of the Debtors' creditors. *See In re American Properties, Inc.,* 14 B.R. 637, 643 (Bankr. Kan. 1981).

27.     That certain of the Borrowers' creditors may have benefited from the CPIF Transfer is irrelevant. If any of the Borrowers' creditors would be hindered or delayed by the transfer, then CPIF is liable. In *Shapiro v. Wilgus*, 287 U.S. 348 (1934), the Supreme Court of the United States upheld this long-standing principle in debtor–creditor law. Writing for the Court, Justice Cardozo explained that "[a] conveyance . . . is illegal if made with an intent to hinder and delay [creditors]. Many an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather the financial storm and pay his debts in full. The belief, even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay." *Id.* at 355.

28.     In *Shapiro*, Herbert Robinson sought forbearance from his creditors. *Id.* at 352. Although most of his creditors consented to delayed payment, two did not and threatened to sue. Robinson then transferred to a newly formed corporation all of his property in exchange for stock and an assumption of his debts and immediately put the new company into receivership to protect it from suit by the non-consenting creditors. Robinson believed that his stratagem would enable him to pay all his debts and even

realize a return to equity. *Id.* at 353. The creditors sued, arguing that the transfer was fraudulent. In spite of Robinson's supposed pure motives, the Supreme Court agreed with the two creditors and held that the debtor's knowledge that even one creditor would be delayed was sufficient to support a finding of actual intent to hinder, delay, or defraud creditors. *Id.* at 354.

29.   The principle articulated in *Shapiro* still governs fraudulent transfer cases under both the Bankruptcy Code and the state Uniform Fraudulent Transfer Acts. *See In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 572 (Bankr. N.D. Cal. 1994). In the *American Properties* case, a business owner sought and obtained bank financing for one of his insolvent companies in a complicated transaction that saddled one of his other companies with debt. 14 B.R. at 643. The Bankruptcy Court held that the transaction was actually fraudulent even though "[t]here was no element of malice towards the creditors . . . because [the owner] genuinely hoped the storm would pass." *Id.* Although [the owner] did not enter the transaction with an intent to defraud American's creditors, he did enter it "with full knowledge harm would come to the creditors," hindering or delaying their ability to receive satisfaction of their debts. *Id.* The transfer was unwound despite Coleman's motive to save one insolvent company and buy time to pay the creditors of one of his other companies.

30.   Recently, the Fifth Circuit cited the *Shapiro* case approvingly in a case affirming a bankruptcy court's avoidance of a marriage partition agreement: "The phrase 'intent to hinder, delay, or defraud' is not defined in the Bankruptcy Code. We find relevant meaning in the fact that the phrase is stated in the disjunctive, which signifies that an

intent to hinder or to delay or to defraud is sufficient." *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 661 (5th Cir. 2017) (also citing *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010) (finding it "sufficient if the debtor's intent is to hinder or delay a creditor"); *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 568 (7th Cir. 1989) (denying discharge where it "[wa]s clear that [the debtor] intended to hinder or delay his creditors, even if he had no intent to defraud them")).

31.     As discussed in Section III above, the Complaint contains numerous specific factual allegations, including most specifically paragraphs 51-62, that the CPIF Transfer had the effect of hindering or delaying the payment of the Borrowers' creditors, and CPIF was fully aware of that effect. CPIF may believe it has defenses to these claims, but it cannot seriously contend that the Complaint suffers from a fatal pleading defect on the question of the Debtors' intent to hinder or delay payment to creditors.

32.     In both paragraphs 38 and 44 of the Motion, CPIF erroneously claims that the Complaint fails to include any of the traditional "badges of fraud" that courts often use to determine a party's intent in an actual-fraudulent-transfer case. But the Complaint identifies at least 4 of the 11 badges of fraud that CPIF recites in paragraph 36 n.6. The Complaint alleges that: the Debtor had been sued multiple times and the Borrowers' principal was under investigation (badge of fraud number 4) (Compl. ¶¶ 21, 24, & 26); the Borrowers received less than reasonably equivalent value in exchange for granting CPIF a lien on substantially all of the Debtors' assets (badge of fraud number 8) (Compl. ¶¶ 69, 80, & 85); the Debtors were insolvent (badge of fraud number 9) (*see* Section III.E above);

the transfer occurred shortly after a substantial debt was incurred (badge of fraud number 10) (Compl. ¶¶ 27-28).

33.     Even if CPIF were correct, and the Complaint failed to include a single "badge of fraud" in asserting an actual-fraudulent-transfer claim, that omission would not necessarily be fatal to the claim. The statutory badges of fraud apply to the Uniform Fraudulent Transfer Act and not to claims brought under § 548 of the Bankruptcy Code, which does not contain a list of badges of fraud. Of course, bankruptcy courts have fashioned common-law badges of fraud that serve a similar purpose to the statutory badges of fraud in the UFTA. Unsurprisingly, the common-law badges of fraud are more expansive than the mere eleven badges in the state fraudulent-transfer statutes. For example, the Fifth Circuit has identified six badges of fraud to help determine fraudulent intent under Bankruptcy Code § 548:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989). Four of these six badges of fraud are described in the Complaint (specifically, numbers 1, 4, 5, and 6).

34.     In *Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008), the Fifth Circuit noted that the badges of fraud, whether found in statute or case law, are "non-exclusive." In keeping with this principle articulated in *Soza*, courts have considered badges of fraud

unique to the facts and circumstances of the case to find factual intent. There is no need to apply a "one size fits all" approach: a badge of fraud in a given case can be any fact that supports the assertion that a debtor intended to hinder, delay, or defraud a creditor. For example, in *Asarco, LLC v. Americas Mining Corp*, the court found that the statutory badges of fraud did not establish fraudulent intent. Nevertheless, the court examined 11 badges of fraud unique to the case and found that these badges of fraud were sufficient to support a finding that the defendant had committed an actual fraudulent transfer. The court explained that "[t]hese statutory badges are non-exclusive, and 'it is clear from the language of the Statute that in determining intent, consideration may be given to factors other than those listed . . . In addition, courts take into account "the particular facts surrounding the conveyance," and avoid determining in a vacuum the presence or absence of a debtor's actual intent to hinder or delay a creditor.'" *Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278, 370 (S.D. Tex. 2008).

35.    In this case, in addition to the statutory badges of fraud described in the Complaint, the Trustee includes numerous other facts in the Complaint that the Court can reasonably identify as "badges of fraud." For example, the Borrowers were being used in a fraudulent Ponzi-like scheme (Compl. ¶¶ 16, 19, 26); the Borrowers were seeking the loan from CPIF to take out a lender that the Borrowers believed was being too strict in its scrutiny of the Borrowers' transactions (Compl. ¶ 28); because the Borrowers cared more about lax oversight than high fees, they failed to negotiate down the onerous terms offered by CPIF (Compl. ¶ 30); and one of the main individuals involved in soliciting investor funds for the Debtors' real-estate projects recently had been convicted of, and

was serving a prison sentence for, fraud (Compl. ¶¶ 8, 17). These badges of fraud, combined with the statutory badges of fraud described in the Complaint, are more than sufficient to sustain a cause of action for actual fraudulent transfer. The Trustee expects that additional badges of fraud may become apparent through the discovery process.

36.     But even though CPIF is wrong in asserting that the Complaint fails to include badges of fraud, the inclusion of badges of fraud is not necessary to maintain an action for an actual fraudulent transfer where, as in this case, a debtor defendant has admitted their intent. In *Wiggains*, the Fifth Circuit held that where "there was direct evidence of a debtor's actual intent to hinder or delay," a court need not even look to "badges of fraud" to infer the debtor's intent to hinder or delay creditors. *Wiggains v. Reed (In re Wiggains)*, 848 F.3d 655, 662 (5th Cir. Tex. February 14, 2017) (citing *Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 158 (Bankr. D.N.M. 1981). The Fifth Circuit explained that "the debtor in *Zouhar* 'candidly admitted the purpose of' his transfer was 'to shield the[] assets from his creditors.'" *Wiggains*, 848 F.3d at 662. The Fifth Circuit continued: "We agree with another court that held: 'When a debtor admits that he acted with the [necessary] intent . . . there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had' that intent." *Id.* (quoting *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986)).

37.     As in *Zouhar*, the Debtors in this case made their intent explicit on multiple occasions, and these admissions are cited in the Complaint (Compl. ¶¶ 34-36).

38.     Finally (with respect to causes of action 1 and 3), in paragraphs 41 and 42 of the Motion CPIF expresses some confusion over what the Trustee seeks to avoid and recover

for the benefit of the bankruptcy estate. But paragraph 66 of the Complaint is clear: "the Trustee sues to avoid the CPIF Transfer made to Defendant CPIF under 11 U.S.C. § 548, to recover the CPIF Transfer or the value thereof from Defendant CPIF under 11 U.S.C. § 550, and to preserve such avoided transfer and any liens associated therewith for the benefit of the Debtors' bankruptcy estate under 11 U.S.C. § 551."

### B. Causes of Action 2, 4, and 5: Constructive Fraudulent Transfer

39.    As with its general objection regarding pleading insolvency, CPIF argues that the Trustee's pleading with respect to the causes of action for constructive fraudulent transfer are deficient because the Complaint lacks specific allegations regarding the Borrowers' solvency (Mot. ¶¶ 51-52). The Trustee refers the Court to the response to general allegations in Section III.E above. The Complaint contains sufficiently specific factual allegations regarding insolvency to sustain the causes of action for constructive fraudulent transfer.

40.    CPIF also argues that, as a matter of law, "the granting of a lien to secure a bona fide loan cannot be constructively fraudulent." (Mot. ¶ 46). But this is based on a tortured reading of the case law, and also ignores the fact that the avoidance action here seeks to avoid not just the granting of a lien to secure an antecedent debt but the entire CPIF Transfer, which was for more than twice the antecedent debt that was owing to TBG.

41.    The only case cited for the proposition that granting a lien to a lender cannot be constructively fraudulent is from New York, and no court within the Fifth Circuit appears to have ever cited it. CPIF offers no relevant controlling case law from the Fifth

Circuit to support its argument, presumably because there is none. Even the case CPIF cites, though, is distinguishable on the facts. First, *Geron* was not decided on a Rule 12(b)(6) motion to dismiss. Second, the court in *Geron* was addressing a circumstance when a lender was refinancing an older unsecured debt from the same lender in the same amount. The court explained that "[t]he security interest did not provide the Lenders with a right to receive anything more than the amount of the money they had provided, and the debtor's liabilities did not increase due to the security interest." *Geron v. Palladin Overseas Fund, Ltd. (In re Applied Theory Corp.),* 323 B.R. 838, 841-42 (Bankr. S.D.N.Y. 2005).7 In this case, by contrast, the Debtors' liabilities increased—by a huge amount. Some antecedent debt, owed to a different lender, was taken out with the new loan. But the majority of the $32 million loan package was not used to pay an antecedent debt, and none of it was used for a debt already owing to CPIF.

42.    CPIF argues that high loan transaction costs, as a matter of law, cannot sustain a claim for constructive fraudulent transfer. CPIF's lone source for this remarkable proposition is a North Carolina bankruptcy case, *Whitaker v. Mortgage Miracles, Inc. (In re Summit Place, LLC),* 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002). But that case does not support CPIF's sweeping interpretation. Rather, the case stands for the pedestrian proposition that lack of reasonably equivalent value cannot be established ***solely*** by the fact that a debtor receives less than 100% of the loan value because all loan transactions have ***some*** fees: "The court cannot accept the Trustee's purely "cash" value analysis,

---

7 The other case CPIF cites, from the Texas Supreme Court, is distinguishable for the same reason: in that case, a debtor granted a security interest to its existing lender to secure a debt already owing to that lender. *First Nat'l Bank v. Hooper,* 104 S.W.3d 83 (Tex. 2003).

because to do so would potentially invalidate virtually every loan transaction; there are always fees associated with the loan and the borrower never gets in cash the full amount it borrows." *Id.* That the facts and circumstances peculiar to the *Summit* case did not support a finding of lack of reasonably equivalent value does not mean that there can **never** be a case where exorbitant fees, combined with other factors—such as those alleged in the Complaint in this case—support a finding of lack of reasonably equivalent value.

43.    In paragraph 49 of the Motion CPIF cites to another case out of this jurisdiction for the proposition that if a transaction is conducted at "arm's length" a cause of action for constructive fraudulent transfer cannot be maintained. *Off. Comm. Of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Redders N. Amer., Inc.)*, 405 B.R. 527, 547 (Bankr. D. Del. 2009). But in that case, the court merely opined that the presence of an "arm's length transaction" was just one of multiple factors to consider in determining whether reasonably equivalent value was provided.

44.    The Fifth Circuit has instructed that "[t]o measure reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors." *Stanley v. US Bank Nat'l Ass'n (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000) ("The proper focus is on the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors."); *see also Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) ("[t]he determination of whether the debtor received REV should be made from the

standpoint of the debtor's creditors, by looking at the net effect of the transfer on the unsecured creditors.").

45.     The Complaint sufficiently alleges that, from the Debtors' creditors' perspective, the Debtors did not receive reasonably equivalent value in exchange for granting CPIF a lien on the Debtors' most significant and valuable assets. For example, paragraph 41 of the Complaint alleges that "[o]ut of that $32 million, nearly $15 million was sent to TBG to pay off loans that these same Debtors and other Debtor entities had only recently obtained; another $960,000 went to Eastern Union Funding as a brokerage fee; $1.12 million went to CPIF as an origination fee; and another approximately $50,000 went to various other third parties. The high costs associated with the CPIF Loan—so soon after the Debtors had secured financing from TBG—left the Debtors in a worse financial condition than before the transaction." The Debtors received no value whatsoever from the $960,000 sent to Eastern Union Funding as a so-called "broker fee." More than half the loan amount was not used to retire antecedent debt owing to TBG. Additionally, paragraph 51 of the Complaint alleges that "[i]ncluded among the recipients of payments that CPIF knowingly approved and released were Philip Carter's criminal-defense attorney and creditors of entities that were not signatories to the CPIF Loan." These payments made out of the CPIF Loan proceeds resulted in the Borrowers not receiving reasonably equivalent value for the security interest conveyed in the CPIF Transfer.

46.     Once again, CPIF may believe that it has winning defenses to the substantive claims asserted by the Trustee in the Complaint. But the question for a Rule 12(b)(6)

motion is whether the plaintiff has satisfied Rule 8's pleading requirements as interpreted by *Twombly, Iqbal,* and their progeny. Under these well-established pleading standards, there can be no question that the Complaint adequately pleads causes of action for constructive fraudulent transfer under both the Bankruptcy Code and TUFTA.

### C. *Cause of Action 9: Preferences*

47.     CPIF argues that, as a matter of law, a lender applying loan proceeds held on reserve to the balance on a loan can never be avoided and recovered as preferences under Bankruptcy Code §§ 548 and 550. (Mot. ¶¶ 53-58).

48.     First, the question at this stage of the proceedings is limited to whether the Trustee has adequately asserted facts to support the elements of a preference under Bankruptcy Code § 547. Whether CPIF might have defenses to the claim under § 548(c) is a separate question not relevant to a Rule 12 motion to dismiss. CPIF is improperly attempting to litigate the substance of the claims asserted in the Complaint rather than the only issue: whether the Complaint asserts a claim upon which relief can be granted.

49.     Under Bankruptcy Code § 547(b), the Trustee can avoid any transfer of an interest of the debtor in property "(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made (A) on or within 90 days before the date of the filing of the petition . . . .(5) that enables such creditor to receive more than such creditor would receive if—(A) the case was a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

50.    The Complaint lays out all the facts necessary to sustain a preference claim. The Complaint alleges that on three occasions within the 90-day preference period CPIF took funds that were on reserve at CPIF, in which the Debtor had a property interest, and used them to pay an antecedent debt that the Debtors owed to CPIF. (Compl. ¶¶ 107-108, 119). The Complaint provides the exact dates and dollar amounts of the alleged preferential payments. The Debtors' insolvency in the preference period is presumed. The preference payments are thus adequately pleaded.

51.    Second, CPIF's defense rests on the assumption that the payments it made to itself with Debtor funds on reserve were payments of "collateral." But that begs the question, as it assumes that the Trustee's causes of action for avoidance of the lien that is the basis for asserting the funds were "collateral" will fail. If the Trustee succeeds on any of the first five causes of action asserted in the Complaint, the payments CPIF made to itself would not have been from "collateral" but would have been Debtor funds held in trust. Alternatively, the Court could grant the Trustee's request to equitably subordinate CPIF's asserted "secured" claim, which also would defeat CPIF's defense to the preference claim. CPIF's defense hinges on whether it succeeds on the other claims the Trustee has asserted. For this reason, it would be erroneous to dismiss the preference cause of action on speculation that CPIF will succeed at a trial on the merits of five of the Trustee's other causes of action as well as the Trustee's request for equitable subordination of CPIF's claim.

#### D. Cause of Action 6: Insider Fraudulent Transfer Under § 24.006(b)

52.     CPIF is correct that the Trustee does not have a viable cause of action under Texas Business and Commerce Code § 24.006(b). The Trustee therefore consents to dismissal of Cause of Action 6 asserted in the Complaint.

#### E. Cause of Action 7: Aiding and Abetting Breach of Fiduciary Duty

53.     CPIF is correct that Texas does not recognize a cause of action for aiding and abetting breach of a fiduciary duty; however, Texas does explicitly recognize a cause of action for "knowing participation in a breach of fiduciary duty," which has similar elements. "To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must assert: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of a fiduciary relationship." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (applying Texas law); *see also D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018).

54.     The Complaint makes sufficiently specific factual allegations to support a claim against CPIF for knowing participation in a breach of fiduciary duty." (*See, e.g.*, Compl. ¶¶ 28-62).

55.     The Trustee will amend the Complaint to change cause of action number 7 from aiding and abetting breach of fiduciary duty to knowing participation in a breach of fiduciary duty.[8]

---

[8] To the extent leave of Court is required, the Trustee asks the Court for leave to amend the Complaint to change cause of action number 7 from aiding and abetting breach of fiduciary duty to knowing participation in a breach of fiduciary duty.

### F. Cause of Action 8: Civil Conspiracy to Commit Fraudulent Transfer

56. The Motion correctly states the elements for a civil conspiracy claim: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." (Mot. ¶ 60 (citing *Tri v. J.T.T.*, 162 S.W. 3d 552, 556 (Tex. 2005). But CPIF wrongly asserts that the Complaint fails to plead a claim for civil conspiracy. The Complaint contains multiple paragraphs describing the civil conspiracy to hinder, delay, or defraud the Debtors' creditors through the closing of the CPIF Transfer. The Complaint identifies the persons involved in the conspiracy: Philip Carter, James Frinzi, and Kelly Carney on behalf of the Debtor Borrowers, and Rob Shields, Brad Shain, and Will Nelson on behalf of CPIF. (Compl. ¶¶ 9-13, 28-50, 103, & 119). The Complaint alleges that the object to be accomplished was the granting of a lien and payment of exorbitant fees to CPIF in exchange for a loan that would be used to help perpetuate Carter's scheme. (Compl. ¶¶ 28-62, 102, & 119). The Complaint describes in some detail the exchange of emails among the co-conspirators that resulted in a meeting of the minds to undertake the unlawful act (the closing of the fraudulent CPIF Transfer, an unlawful act). (Compl. ¶¶ 31-36). And the Complaint alleges that creditors of the Debtors were harmed as a result of the conspiracy. (Compl. ¶¶ 105 & 118). The Complaint, therefore, adequately states a claim for civil conspiracy to commit a fraudulent transfer).

### G. Equitable Subordination

57. As part of the Trustee's objection to CPIF's proof of claim, which objection was included in the Complaint, the Trustee has requested that the Court equitably

subordinate CPIF's claim under Bankruptcy Code § 510(c). CPIF asserts that the Complaint fails to state a claim for equitable subordination, arguing that equitable subordination of a creditor's claim is strictly limited to just "three general paradigms." (Mot. ¶ 64). CPIF is wrong.

58.    Bankruptcy Code § 510(c) provides that:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may --(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

59.    Bankruptcy courts have long been recognized as courts of equity. *See Local Loan Co. v. Hunt*, 292 U.S. 234 (1934). Their equitable powers allow them to "produce fair and just results 'to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *In re Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991) (quoting *Pepper v. Litton*, 308 U.S. 295 (1939))."

60.    "This Court has enunciated a three-prong test for equitable subordination: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re Fabricators, Inc.,* 926 F.2d 1458, 1464-65 (5th Cir. 1991) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.

1977)). Concerning what constitutes "inequitable conduct" under the first prong, the Fifth Circuit "has recognized three general categories of conduct considered sufficient to warrant equitable subordination: (1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Missionary Baptist Found., Inc.*, 712 F.2d 206, 212 (5th Cir. 1983).

61.     The Complaint alleges that CPIF aided and abetted, and conspired with, the Debtors to engage in a transaction that was actually fraudulent, that transaction resulted in injury to the Debtors' creditors, and it gave CPIF an unfair advantage over them. (Compl. ¶¶ 28-62, 118-119). The allegations in the Complaint are more than sufficient to sustain a claim for equitable subordination and shift the burden to CPIF to show why its claim should not be subordinated.

Dated:  June 18, 2020

By: /s/    *Judith W. Ross*
Judith W. Ross, State Bar No. 21010670
Frances A. Smith, State Bar No. 24033084
Eric Soderlund, State Bar No. 24037525
Jessica L. Voyce Lewis, State Bar No. 24060956
**Ross & Smith, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com
        frances.smith@judithwross.com
        eric.soderlund@judithwross.com
        jessica.lewis@judithwross.com

**COUNSEL TO CHAPTER 11 TRUSTEE
DAVID WALLACE**